542 So.2d 1190 (1988)
ST. PAUL FIRE & MARINE INSURANCE COMPANY and Druid City Hospital Board
v.
J.E. NOWLIN, administrator of the estate of James E. Nowlin, deceased.
J.E. NOWLIN, administrator of the estate of James E. Nowlin, deceased
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY and Druid City Hospital Board.
86-50, 86-96.
Supreme Court of Alabama.
July 8, 1988.
Rehearing Denied January 13, 1989.
Dissenting Opinion from Denial of Rehearing April 14, 1989.
*1191 Michael S. Burroughs of Phelps, Owens, Jenkins, Gibson & Fowler, Tuscaloosa, for appellants, cross-appellees.
Edward F. Morgan, Tuscaloosa, for appellee, cross-appellant.
James W. Webb and Dorothy W. Littleton of Webb, Crumpton, McGregor, Sasser, Davis & Alley, Montgomery, for amicus curiae Association of County Commissions of Alabama.
Sydney Lavender of Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, for amicus curiae Alabama Hosp. Ass'n.
Lloyd W. Gathings and Timothy C. Davis of Gathings & Tucker, Birmingham, for amicus curiae Alabama Trial Lawyers Ass'n.
Drayton N. Hamilton, Montgomery, for amicus curiae Alabama League of Municipalities.
Don Siegelman, Atty. Gen., and Thomas R. Allison, Asst. Atty. Gen.
STEAGALL, Justice.
J.E. Nowlin, administrator of the estate of James E. Nowlin, brought a wrongful death action against the Druid City Hospital Board ("Board"), and on October 12, 1982, the jury returned a verdict in favor of Nowlin for $500,000. St. Paul Fire & Marine Insurance Company ("St. Paul"), the Board's insurance carrier, paid $100,000 of the judgment on behalf of the Board. The trial court granted the Board's Rule 60(b), A.R.Civ.P., motion for relief from judgment, and reduced the judgment to $100,000. Nowlin appealed to this Court, which determined on June 14, 1985, that the Rule 60(b) motion had been improperly granted and that the $500,000 judgment should stand as final. See Nowlin v. Druid City Hospital Board, 475 So.2d 469 (Ala.1985). The Board's application for rehearing was denied on August 23, 1985.
On June 26, 1985, Nowlin obtained a writ of garnishment against St. Paul. St. Paul filed an answer to the garnishment, denying any indebtedness or liability to the Board and alleging that the circuit court lacked jurisdiction to issue a writ of garnishment prior to the issuance of a certificate of judgment by this Court in the appeal. After this Court overruled the application for rehearing, Nowlin obtained a second writ of garnishment against St. Paul on November 20, 1985. Both the Board and St. Paul denied any indebtedness, asserting that the Board was entitled to the protection of Ala.Code 1975, § 11-93-2,[1] and that the Board had fulfilled its obligations to Nowlin. The Board and St. Paul also asserted that Nowlin was barred from relitigating the issues raised in the first garnishment proceeding by the principle of res judicata.
The parties entered into a stipulation of facts and filed briefs with the trial court. After hearing arguments of counsel, the trial court rendered judgment on September 2, 1986, stating as follows in its order:
"1. Section 11-93-2 of the Code of Alabama is constitutional, and affords protection to defendant Druid City Hospital Board from further execution by the plaintiff.

*1192 "2. The initial garnishment filed by the plaintiff was void because:
"(a) The order of this Court of February 9, 1983, effectively stayed execution on the judgment, since it reduced the judgment to $100,000.00.
"(b) Druid City Hospital Board is an instrumentality of the State of Alabama as contemplated by Rule 62(e), A.R.C.P.
"(c) The instant case was pending before the Supreme Court of Alabama at the time the initial garnishment was issued.
"3. The effect of the judgment of $500,000.00 creates an indebtedness against the defendant Druid City Hospital Board even though immunity from liability for payment of said judgment is afforded said defendant by Code of Alabama [, §] 11-93-2.
"4. Defendant Druid City Hospital Board had insurance coverage of at least $500,000.00 through the garnishee.
"5. The plaintiff, judgment creditor is entitled under Code of Alabama [, §] 27-23-2, to have the insurance money provided in the contract of insurance between the insurer and the defendant, applied to the satisfaction of the judgment.
"6. It is therefore ORDERED, ADJUDGED and DECREED that a final injunction issue enjoining the plaintiff from further execution against the property of the defendant Druid City Hospital Board.
"7. It is the further ORDER, JUDGMENT, and DECREE of the Court that the plaintiff recover of the garnishee, St. Paul Fire & Marine Insurance Company, the sum of $400,000, plus the interest due thereon provided the same does not exceed the insurance coverage provided to Druid City Hospital Board by St. Paul Fire & Marine Insurance Company...."
St. Paul and the Board appeal from those parts of the trial court's order holding that the judgment created an indebtedness against the Board and that Nowlin is entitled to recover from St. Paul either through garnishment or under the provisions of Ala.Code 1975, § 27-23-2.[2] Nowlin cross-appeals from the portion of the judgment holding that Ala.Code 1975, § 11-93-2 is constitutional; that the Board is entitled to protection under § 11-93-2; and that a final injunction issue preventing Nowlin from further execution against the Board. We will address the constitutionality of § 11-93-2 first and then discuss the propriety of the trial court's order.

I
On cross-appeal, Nowlin argues that Act 673, Ala.Acts 1977, codified at § 11-93-2, violates Article IV, Section 45, Constitution of Alabama 1901, which requires that "[e]ach law shall contain but one subject, which shall be clearly expressed in its title." He offers two reasons. First, Nowlin contends that the title of that act does not clearly explain what is contained in the body of the act because it does not indicate that a hospital board is considered a governmental entity for purposes of the act. Second, Nowlin argues that the body of the act is overbroad, specifically because its title states that it establishes monetary limits payable on tort judgments, while Section 2 of the act purports to limit recovery of damages under "any judgment." We disagree with both arguments.
The title to Act 673 states that its purpose is:
"To prescribe and establish monetary limits payable on claims and judgments based on tort liability and filed or obtained *1193 against governmental entities; to define terms."
Section 11-93-1(1) defines "governmental entity" as including "county or city hospital boards when such boards are instrumentalities of the municipality or county." Act 540, Ala.Acts 1947, creating the Druid City Hospital Board, specifically says that the property of the Board is to be owned jointly by the County of Tuscaloosa and the City of Tuscaloosa. Nowlin further argues that the title to Act 540 does not sufficiently indicate the necessary agency relationship between the Board and the City and County of Tuscaloosa for the Board to be considered a "governmental entity" as that term is defined in § 11-93-1.
"The general rules with respect to the `clear expression' requirements of § 45 are:
"`[W]hen the title is so misleading and uncertain that the average legislator or person reading the same would not be informed of the purpose of the enactment, it is insufficient.' Pillans v. Hancock, 203 Ala. 570, 84 So. 757, 759 (1919).
"`"The title must be such, at least, as fairly to support or give a clue to the subject dealt with in the act, and unless it comes up to this standard, it falls below the constitutional requirements." `Clutts v. Jefferson County Board of Zoning Adjustment, 282 Ala. 204, 210, 210 So.2d 679, 684 (1968)....
"Opinion of the Justices, 294 Ala. 555, 319 So.2d 682 (1974)."
Tyson v. Johns-Manville Sales Corp., 399 So.2d 263, 270 (Ala.1981).
The purpose of Act 540 is set out at length in the title, which mentions the administration, regulation, and nature of the Druid City Hospital Board. Although the title does not explicitly state that the Board is the agent of the City and County of Tuscaloosa, it sufficiently describes that relationship so that the average legislator or person reading it was informed of the subject of the act. Requiring further detail would amount to duplication of the very act the title precedes.
Similarly, the title to Act 673 specifically states that definitions are within the body of the act, and the definition of "governmental entity" explicitly includes hospital boards. The title is in no way so misleading or uncertain as to render it unconstitutional.
Regarding the overbreadth claim, "[i]t is the duty of the court to construe every word in each section of a statute consistent with the other sections in pari materia." Winner v. Marion County Commission, 415 So.2d 1061, 1063 (Ala. 1982). "Sections in the Code dealing with the same subject matter are in pari materia. Kelly v. State, 273 Ala. 240, 139 So. 2d 326 (1962). As a general rule, such statutes should be construed together to ascertain the meaning and intent of each." Locke v. Wheat, 350 So.2d 451, 453 (Ala. 1977).
Section 11-93-1(5) defines a "claim" as:
"Any claim against a governmental entity, for money damages only, which any person is legally entitled to recover as damages caused by bodily injury or property damage caused by a negligent or wrongful act or omission committed by any employee of the governmental entity while acting within the scope of his employment, under circumstances where the governmental entity, if a private person, would be liable to the claimant for such damages under the laws of the state of Alabama." (Emphasis added.)
Section 11-93-3 states:
"This chapter is not intended and shall not be construed to subject any governmental entity to liability for tort claims where liability therefor does not already exist by law. It shall not authorize any governmental entity to be sued where such authorization does not already exist by law." (Emphasis added.)
Reading these sections together, it is clear that § 11-93-2 applies only to tort judgments. We therefore hold that § 11-93-2 does not violate Article IV, Section 45, of the Constitution, and we affirm that portion of the trial court's order finding § 11-93-2 constitutional.

*1194 II
The second issue Nowlin raises was referred to but not decided by this Court in Nowlin v. Druid City Hospital Board, supra, when we concluded that "the issues relating to the constitutionality of [§ 11-93-2] and the possibility of recovering any excess from the entity's insurance company are not ripe for our review." Nowlin v. Druid City Hospital Board at 475 So.2d 471. Having resolved the constitutionality issue, we turn now to the question of whether Nowlin may collect from St. Paul the remaining $400,000 of his judgment against the Board.
Deciding this requires us to ascertain the intent of the legislature in passing § 11-93-2. "One approach in determining the legislative purpose and intent is to examine the prior law, and related statutes, on the subject embraced in the statute being construed." State v. AAA Motor Lines, 275 Ala. 405, 155 So.2d 509, 510 (1963). The purpose behind § 11-93-2 was stated by this Court in Home Indemnity Co. v. Anders, 459 So.2d 836, 841 (Ala. 1984), when we quoted with approval from Stanhope v. Brown County, 90 Wis.2d 823, 280 N.W.2d 711 (1979):
"`It is within the legitimate power of the legislature to take steps to preserve sufficient public funds to ensure that the government will be able to continue to provide those services which it believes benefits the citizenry. We conclude that the legislature's specification of a dollar limitation on damages recoverable allows for fiscal planning and avoids the risk of devastatingly high judgments while permitting victims of public tortfeasors to recover their losses up to that limit.'"
First, the trial court held that the $500,000 judgment created an indebtedness against the Board even though it was immune from liability for more than $100,000 under § 11-93-2. For an indebtedness to exist, there must be an obligation to pay. Cf., Taxpayers and Citizens of Town of Georgiana v. Town of Georgiana, 265 Ala. 654, 93 So.2d 493 (1956) (bonds issued with obligation to pay constitute an indebtedness), with Scott v. Alabama State Bridge Corp., 233 Ala. 12, 169 So. 273 (1936) (bonds issued without obligation to pay do not constitute an indebtedness). We fail to see how the Board can be indebted for more than it is statutorily obligated to pay; thus, the trial court was incorrect on this point.
Second, the trial court held that Nowlin could collect the remaining $400,000 from St. Paul by way of hypothecation under § 27-23-2. The contract between the Board and St. Paul provided that St. Paul would pay on behalf of the Board "all sums which the insured shall become legally obligated to pay as damages" for the activities covered in the policy. (Emphasis added.)
The law is clear that a judgment creditor's right under § 27-23-2 to proceed against the insurance company to satisfy a judgment obtained against the defendant/insured is dependent upon the rights of the insured against its insurer under the policy. "Under Alabama law, the injured party acquires a vested interest (secondary) in the nature of a hypothecation of the insured's rights under the policy." Maness v. Alabama Farm Bureau Mutual Casualty Insurance Co., 416 So.2d 979, 981 (Ala.1982). (Citations omitted.)
"The controlling question ... is not so much whether there was a `final judgment,' as mentioned in [the predecessor to § 27-23-2], but whether there was due to be paid to the insured by the insurer a sum fixed by the judgment.... That is, to inquire whether ... defendant in the judgment, the insured, could maintain a suit on the policy against [the] insurer, as declared by the policy. For if he could, plaintiff acquired the statutory power in equity to reach that claim...."
Ohio Casualty Insurance Co. v. Gantt, 256 Ala. 262, 267, 54 So.2d 595, 600 (1951).
Because the Board is not "legally obligated to pay" Nowlin more than $100,000 under § 11-93-2, St. Paul is not obligated under its contract with the Board to pay the $400,000 as ordered by the trial court. See also Kulp v. United States Fidelity & Guaranty Co., 529 So.2d 966 (Ala.1988).
*1195 Finally, we note with approval the prevailing view among the states that "a governmental unit's immunity from tort liability is unaffected by its procurement of insurance which purports to protect it from such liability." Thompson v. Druid City Hospital Board, 279 Ala. 314, 315, 184 So.2d 825, 826 (1966).
Therefore, we reverse that portion of the trial court's judgment finding an indebtedness against the Board of $500,000 and allowing Nowlin to collect $400,000 of that amount from St. Paul, and we remand this case to the trial court to enter an order discharging St. Paul on the writ of garnishment.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and MADDOX, ALMON, SHORES, BEATTY, ADAMS and HOUSTON, JJ., concur.

ON APPLICATION FOR REHEARING
STEAGALL, Justice.
APPLICATION OVERRULED.
TORBERT, C.J., and MADDOX, SHORES, BEATTY and HOUSTON, JJ., concur.
JONES and ADAMS, JJ., dissent.
JONES, Justice (dissenting from denial of application of rehearing).
With the utmost respect and deference, I strenuously dissent. The Court's opinion is so fundamentally flawed as to impugn the credibility of the decision-making process. Structurally, the opinion is deficient because it fails to address the only issue presented: whether St. Paul, under the applicable provisions of its policy, is liable to the third-party beneficiary as a judgment creditor of the insured. Substantively, it fails to recognize and apply settled, traditional rules of law to undisputed facts.
I do not make such strong statements lightly. Indeed, if this were a case in which the application of a traditional rule of law invoked competing public policy considerations and I simply disagreed with the majority's choice of which policy should prevail, I would readily concede that our difference of opinion would pale into insignificance. (Rarely in such cases, whichever policy consideration prevails, does our system of precedential jurisprudence suffer.)
But this is not a "policy call" case. I agree with the trial judge, who wisely approached the issue of St. Paul's liability by the use of a two-step analysis: 1) What effect does § 11-93-2 have on the plaintiff's judgment of $500,000 against the municipal board? (Stated another way, does the $100,000 statutory cap on the judgment creditor's right of recovery against the Board reduce the judgment to $100,000?); and 2) If the judgment is not so reduced, what is St. Paul's liability to the plaintiff, as the third-party beneficiary of the Board's contract of insurance with St. Paul, pursuant to the policy provisions and § 27-23-2 (the statute authorizing a third-party direct action after final judgment against the insurer)?
Clearly and irrefutably, as the trial court's judgment indicates, the answers to these two questions are not dependent upon the selection of a choice from among various competing public interest considerations; rather, the answers, governed by settled, traditional principles of law, are as simple and straightforward as are the questions. Correctly, the trial court relied upon Nowlin v. Druid City Hospital Board, 475 So.2d 469 (Ala.1985) ("Nowlin I"), for the proposition that "[§ 11-93-2] does not ... limit the amount of the judgment." Indeed, the express wording of the statute ("The recovery ... shall be limited") recognizes that the "single judgment" rule would be violated if the statutory cap on recovery against the governmental entity also had the fortuitous effect of reducing the liability of nonprotected joint tort-feasors. In other words, § 11-93-2 is an exemption-from-execution statute, not one that affects the judgment.
In answering the second question (the issue of St. Paul's liability), the trial court (again correctly) looked to § 29-23-2 (rights of third-party beneficiaries as judgment creditors) and to the express language *1196 of St. Paul's insurance policy. Here, the answer is made simple, because the statutory language and the policy language are virtually identical. (Obviously, the policy language is used in a conscious effort to comply with the statutory mandate.) This statutory and policy language lends itself to but a single conclusion: Once a third-party beneficiary secures a final judgment, that party, as a judgment creditor, may proceed directly against the insurer "to reach and apply the insurance money to the satisfaction of the judgment." Maness v. Alabama Farm Bureau Mut. Cas. Ins. Co., 416 So.2d 979 (Ala.1982).
How, then, did this Court arrive at a contrary conclusion and reverse the judgment appealed from? The answer to this question lies in a close examination of the opinion. Initially, the opinion seems to adopt, and to accept as a proper premise, Nowlin I's proposition that § 11-93-2 does not reduce the $500,000 final judgment to a $100,000 final judgment. I use the term "seems to" because, after declaring § 11-93-2 constitutional (an issue raised by Nowlin on cross-appeal but now conceded on application for rehearing), the opinion reads:
"The second issue Nowlin raises was referred to but not decided by this Court in Nowlin v. Druid City Hospital Board, supra, when we concluded that `the issues relating to the constitutionality of [§ 11-93-2] and the possibility of recovering any excess from the entity's insurance company are not ripe for our review.' Nowlin v. Druid City Hospital Board at 471. Having resolved the constitutionality issue, we turn now to the question of whether Nowlin may collect from St. Paul the remaining $400,000 of his judgment against the Board."
Thus, it would appear that the opinion has laid the foundation for setting forth and analyzing the terms of the insurance contract between the Board and St. Paul, particularly with reference to its third-party beneficiary provisions and their interplay with § 27-23-2. (After all, the instant suit is prosecuted pursuant to that statute.) Curiously, instead of turning immediately to the policy language, the second paragraph under Part II of the opinion addresses a non-issue: "the intent of the legislature in passing § 11-93-2."
Following the discussion of the given "intent of § 11-93-2," the opinion concludes that "For an indebtedness to exist, there must be an obligation to pay" and adds, "We fail to see how the Board can be indebted for more than it is statutorily obligated to pay." By these two conclusions, both of which confuse the law of judgments (which, by definition, determines the obligations of the parties) and the law of exemptions from execution (which, by definition, limits the judgment creditor's right of recovery), the majority opinion overrules Nowlin I and holds that the judgment, by virtue of § 11-93-2, was effectively reduced from $500,000 to $100,000. (This point is more fully discussed in "A Proposed Opinion" that follows.)
Having erroneously concluded that the Board's legal obligation, as determined by the judgment, is reduced by the $100,000 statutory limit on the judgment creditor's right of recovery (thus, recasting Nowlin I's conclusion "that the $500,000 judgment should stand as final"), the opinion then proceeds to examine St. Paul's liability under its policy with the Board. Now, with its new "reduction of the Board's obligation" premise, the opinion sets out a single policy provision: "The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages...." Missing from the opinion is the entire "third-party beneficiary" section of the policy, the provisions of which are addressed later in this dissent.
To be sure, if the exemption statute, which, by its express terms, limits the judgment creditor's right of recovery, is interpreted as reducing the judgment, and, thus, the Board's obligation, and if St. Paul's liability is limited to the Board's legal obligation to pay, then St. Paul's payment of $100,000 satisfies the judgment and the trial court erred in holding otherwise. But neither of these two "if's" is accurate. Because we have already demonstrated why the statutory cap on the *1197 plaintiff's right of recovery against the Board does not affect the judgment, let us now look at the second "if":
Not only does the opinion not quote any of the policy provisions mandated by § 27-23-2, but none of the three cases cited in support of its "no liability" conclusion stands for the proposition for which it is cited. (For a full discussion of the applicable policy language, see "A Proposed Opinion," following in this dissent.) Perhaps the most telling of the miscited cases is the quoted language from Ohio Casualty Ins. Co. v. Gantt, 256 Ala. 262, 267, 54 So.2d 595, 600 (1951):
"The controlling question ... is not so much whether there was a `final judgment,' as mentioned in [the predecessor to § 27-23-2], but whether there was due to be paid to the insured by the insurer a sum fixed by the judgment.... That is, to inquire whether ... defendant in the judgment, the insured, could maintain a suit on the policy against [the] insurer, as declared by the policy. For if he could, plaintiff acquired the statutory power in equity to reach that claim...."
That language is quoted for the proposition that the insurer is liable to the judgment creditor only to the extent that the third party is entitled to claim against the insured. In fact, the full language from Gantt shows just the opposite. Why the opinion omitted material portions of the quoted paragraph, which completely change the meaning of the case for the purpose cited, I am at a loss to explain. It is apparent from a full review of the case that the plaintiff in Gantt proceeded directly against the insurer, while the judgment against the insured was on appeal. Because the appeal was without supersedeas, the Court affirmed the judgment creditor's right to sue the insurer directly based on the insured's obligation as determined by final judgment.
The Gantt Court held that, if the insured had a "final judgment" against him, unaffected by the appeal, either the judgment debtor or the judgment creditor could require the insurer to honor its policy. (For a more complete text of the Gantt opinion, see "A Proposed Opinion" that follows.) Moreover, the language in the Gantt policy was less favorable to the judgment creditor than the language in the St. Paul policy. The Gantt Court relied heavily on the following language:
"Any person ... who has secured such a judgment ... shall thereafter be entitled to recovery under the terms of the policy in the same manner and to the same extent as the insured." (Emphasis added.)
Conversely, the St. Paul policy reads:
"Any person ... who has secured judgment ... shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy." (Emphasis added.)
The restrictive words "to the same extent as the insured" in the Gantt policy do not appear in the St. Paul policy. The Gantt Court explained: "So that according to the terms of the policy defendant insured can sue the insurer by reason of liability imposed by law...." While in Gantt the Court relied on "the terms of the policy," the opinion in this case has not even referred to the terms of the policy.
It is ironic that this Court would ignore applicable policy language, while the Fifth Circuit Court of Appeals in Fleming v. Pan American Fire & Casualty Co., 495 F.2d 535, 541 (5th Cir.1974), expressed no difficulty in dealing with policy language on point with the St. Paul policy:
"We agree with the District Court that Fleming had become a third-party beneficiary under the terms of the policy itself. That was the theory supported by Alabama cases which this court had followed in Pennsylvania Thresherman & F. Mut. Cas. Co. v. Crapet, 199 F.2d 850, 853-54 (5th Cir.1952).
"The policy of insurance itself provided that any person who has secured a judgment against the insured, liability for which is insured against, `shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.'" (Emphasis added.) *1198 Just as curiously, the majority opinion in this case also cites Maness v. Alabama Farm Bureau, supra, which held:
"The cross-claims of the Manesses against the insurance carriers are a form of direct action against an insurance carrier and not allowable under Alabama law because an injured party cannot bring a direct action against the insurance carrier, absent a final judgment against its insured, see Code 1975, §§ 27-23-1 and -2."
What that holding has to do with this case is beyond my capacity to understand. I suppose the quoted language from Maness is intended to suggest that the judgment creditor's right to sue the insurer is "secondary" and does not stand on equal footing with the rights of the insured. If that is what is intended, then that, too, is misguided, for all of the cases cited in support of the quoted language from Maness were decided pursuant to policy language identical to the applicable language in Gantt, and not pursuant to § 27-23-2 and the compatible language of St. Paul's policy. Moreover, Maness correctly states, "Once an insured party has recovered a judgment against the insured, the injured party may compel the insurer to pay the judgment." (Emphasis added.) Interestingly, as we have already noted, St. Paul's policy echoes the identical statutory theme:
"Any person ... who has secured such judgment ... shall thereafter be entitled to recover under this policy...."
We now come to the most curious of all the authorities cited in the majority opinion: Kulp v. United States Fidelity & Guaranty Co., 529 So.2d 966 (Ala.1988). Surely, this must represent a first in precedential jurisprudence! Lacking authority otherwise, the Court released two cases on the same date (Kulp and the instant case), each citing the other as authority for its holding. I will leave that without further comment.
There is yet another flaw in the opinion that is perhaps the most striking of all. Not only does the opinion fail to apply settled principles of contract law to the relevant provisions of the insurance policy, but it violates the most fundamental tenet of the law of contractsthe freedom of the parties to contract in the first instance. Section 11-93-2 does indeed contain two proscriptions: 1) It proscribes the judgment creditor's recovery of more than $100,000 against the municipal Board; and, 2) it proscribes the Board's settlement of any single injury claim for more than $100,000. Both proscriptions have a single purposeto protect the public treasury.
But there is no prohibition against the Board's right to contract with an insurer for coverage in excess of the statutory cap. What possible public policy consideration could be served by prohibiting the expenditure of public funds to purchase coverage for the protection of members of the public as third-party beneficiaries of such coverage? And beyond this, what possible public interests could be served in protecting the insurer that exercised its choice to accept the additional premiums in exchange for its promise to pay the insured's obligation as determined by final judgment after actual trial?
Incredibly, this Court has construed § 11-93-2 to declare that the contract of insurance between the Board and St. Paul is void to the extent that it exceeds the judgment creditor's right to recover against the Board. I suppose this means that the City of Tuscaloosa, through the Board, is liable to its taxpayers, to the extent of the excess premiums, for entering into a contract that is void as against public policy.
This also raises another interesting question: Now that Nowlin concedes that the trial court correctly barred him from effecting further recovery against the Board, the Board's interest, on the rehearing of this case, is realigned with Nowlin's, for surely the Board's and St. Paul's interests are now antagonistic. To be sure, the Board's right of redress against St. Paul for breach of its contract of insurance is as complete and viable as is Nowlin's right of redress. Despite this "realignment of interests," as a matter of law, it is interesting to note that the only brief filed in opposition to the application for rehearing *1199 was the brief filed jointly on behalf of St. Paul and the Board, making the Board an adversary of one of its own citizens for whose protection it expended public funds in payment of the excess coverage premium.
The sharpness and persistency of my language in dissent is not intended to be vitriolic. Rather, my purpose is merely to place in keen focus the unaddressed issue in the case. Instead of determining the insurer's liability by acknowledging and analyzing the pertinent provisions of the insurance policy and then applying to those provisions traditional rules of contract law to arrive at a decision, the majority opinion restricts its review to the limitation of § 11-93-2 on the judgment creditor's right to recover against the Board. It then asks the rhetorical and superficial question: If the insured is not legally obligated to pay more than $100,000, how can St. Paul be obligated to pay more? The opinion asks this question as though the answer were automatic: "Of course, St. Paul's obligation to pay cannot be more than the Board's obligation."
It seems utterly impossible that this Court could overlook the multiple, obvious situations in which insurers are held accountable according to the terms of their policy without regard to the insured's insolvency, bankruptcy, or right to claim under any number of statutory exemptions from payment of a judgment. To be sure, this is what casualty insurance is all about.
Suppose an insured, as a judgment debtor, is entitled to the statutory personal or real property exemption or the statutory wage earner's exemption. Would anyone seriously contend that the judgment debtor's insurer could avail itself of those exemptions as a defense to the judgment creditor's direct action against the insurer? Suppose, further, that the spouse of a deceased insured claimed her statutory homestead exemption to avoid execution for payment of certain debts against the estate. Could the insurer of the deceased tort-feasor use the personal representative's claim of exemption as a defense to a suit against the estate?
Consider yet another hypothetical: Could the guarantor of a promisory note plead the maker's discharge in bankruptcy, or the maker's rights under any other claim of statutory exemption, as a defense to the holder's direct claim against the guarantor? Surely, this Court does not intend to answer any of these questions in the affirmative; and, yet, by allowing St. Paul to plead the Board's statutory exemption, that is precisely the effect of the majority opinion.
Having taken the opinion apart, piece by piece, and having criticized both the structure and the substance of the majority opinion, I feel constrained to heed the adage "One should not criticize poetry lest he pen a verse, nor condemn art lest he paint a picture." Then, too, I believe that a wayward rule of law, like the carrier pigeon, seeks its way back home; thus, I propose the following opinion in the hope that it may some day serve as a faint "light in the window" to guide the prodigal's homeward journey.

A Proposed Opinion
PER CURIAM.
St. Paul Fire and Marine Insurance Company ("St. Paul") and the Druid City Hospital Board ("Board") appeal from those parts of the trial court's order holding that the $500,000 judgment in favor of plaintiff J.E. Nowlin ("Nowlin") created an indebtedness against the Board and that Nowlin is entitled to recover the unpaid balance of $400,000 from St. Paul either through garnishment or under the provisions of Ala.Code 1975, § 27-23-2, which provides:

"Upon recovery of a final judgment against any person, firm or corporation by any person, including administrators or executors, for loss or damage on account of bodily injury, or death or for loss or damage to property, if the defendant in such action was insured against the loss or damage at the time when the right of action arose, the judgment creditor shall be entitled to have the insurance money provided for in the contract of insurance between the *1200 insurer and the defendant applied to the satisfaction of the judgment, and if the judgment is not satisfied within 30 days after the date when it is entered, the judgment creditor may proceed against the defendant and the insurer to reach and apply the insurance money to the satisfaction of the judgment."

Because, on rehearing, Nowlin withdraws all issues presented on cross-appeal, thus conceding the constitutional validity of § 11-93-2,[1]we will address only the propriety of the trial court's order as it relates to the issue presented on appeal.
Reduced to its simplest terms, the issue presented is the one referred to but not decided by the Court in Nowlin v. Druid City Hospital Board, 475 So.2d 469 (Ala. 1985) (Nowlin I), when it concluded that "the issues relating to the constitutionality of [§ 11-93-2] and the possibility of recovering any excess from the entity's insurance company are not ripe for our review." Nowlin I, at 471. Because constitutionality has been conceded, the single question, then, is whether Nowlin may collect from St. Paul the remaining $400,000 of his judgment against the Board.
We begin our analysis by reaffirming the narrow issue decided in Nowlin I: "[Section 11-93-2] sets forth the maximum amount of damages recoverable against a governmental entity. It does not, however, limit the amount of the judgment." That holding is implicitly based on several fundamental propositions. Primarily, the legislative intent is clearly expressed in terms of a limitation on the right of recovery from the governmental entity and not in terms of a limitation on the judgment.
Beyond the express purpose of the statute to protect the public treasury, its intent to limit the judgment creditor's right of recovery against the governmental entity, as opposed to an intent to limit the judgment, which may affect other parties, finds support in this state's history of governmental immunity. We need not recount the details; it is sufficient to say that, after the Court recognized the long-ignored legislative will to abolish municipal and county immunity from tort liability,[2]the legislature responded not by reestablishing the Court-imposed immunity, but by affirming the Court's recognition of the legislative abolition of immunity and by imposing a cap on the judgment creditor's right to recover from the public treasury to the extent that the judgment exceeds the sum of $100,000.
Thus, the trial court's reference to the Board's "immunity" in the phrase "immunity from liability for payment of said judgment" is technically incorrect (most probably the trial court intended to use the word in its non-technical sense). In light of its legislative history and its express language, § 11-93-2 is not a statute of "immunity," as that term is legally understood, but one of "exemption from execution" against a governmental entity with respect to any judgment in excess of $100,000.
Further considerations underlying the "nonreduction of the judgment" holding of Nowlin I include the interplay of those fundamental principles inherent in three separate, but related, traditional bodies of law: the substantive law of judgments (a final determination of obligations), the procedural law of execution (the enforcement of judgments), and the procedural law of exemptions from execution (a bar to the judgment creditor's right of recovery). Because the basic tenets of each of these common law concepts are so irrefutably established, a brief treatment of each is sufficient for our analysis. *1201 The Law of Judgments: A final judgment by a court of competent jurisdiction establishes the rights and obligations of the party litigants. This invariably accepted interpretation of a judgment is illustrated by the following quotes from 46 Am.Jur.2d Judgments (1969):

"A judgment is the law's last word in a judicial controversy. It is the result of the application of legal principles to the state of facts presented to the court. It may be defined as the court's official and final consideration and determination of the respective rights and obligations of the parties...."
Section 1 at 313.
"The judgment is regarded as a solemn record, or as a security of record, upon which valuable rights rest. Indeed, the first and most obvious consequence of a judgment is that it establishes an indisputable obligation, and a final judgment definitely fixes the rights and liabilities of the parties in the action as to the matters submitted to the court for decision."
Section 229 at 463.
"A judgment for the recovery of money has been described as a debt, or a form of indebtedness, or evidence of indebtedness, as a debt of record, and as a security of record showing a debt due from one person to another. In some cases, it has been declared that a judgment is a higher form of the debt on which the action is brought, or a new debt of the highest dignity."
Section 232 at 464.
This Court, in Mayor & City Council of Anniston v. Hurt, 140 Ala. 394, 37 So. 220 (1904), spoke to the finality aspect of a judgment:
"But the [non-survivability of a tort action] rule does not apply, when the action has been prosecuted to final judgment in favor of the injured party. It then becomes a debt owing by the party inflicting the injury to the party injured."
140 Ala. at 401, 37 So. at 222 (the meaning of the term "final judgment," as used here, of course, is not the same as that term is used in § 12-22-2, authorizing an appeal as of right). That a judgment is an obligation (as a debt) created by an order of a court is expressly recognized in Turnpaugh v. Wolf, 482 N.E.2d 506 (Ind. Ct.App.1985); and In Re Bassford's Will, 91 N.Y.S.2d 105 (N.Y.1949).
Legal scholars have addressed the operative effect of a judgment:

"The first and most obvious consequence of a judgment is that it establishes an indisputable obligation and confers upon the successful party the right to issue execution or other process of the court for its enforcement...."
1 Black On Judgments § 4, at 8.
"At law, the judgment is yea or nay, for one party and against the other and recognizes no lien, awards no execution, against specific property unless when the proceeding is in rem; but simply contains the conclusion of `the law upon the facts proved, and leaves the party to his legal and appropriate writ to enforce it.'"
1 Freeman On Judgments § 2, at 5, quoting from Kramer v. Rebman, 9 Iowa 114 (1859).
The Law of Executions: Ala.Code 1975, § 6-9-1, provides:
"The party in whose favor a judgment is entered, whether for debt, damages or costs, for the satisfaction thereof, may, within 10 years thereafter, have a writ of execution against the lands and goods of the party against whom such judgment is entered. When the judgment is for specific property or the alternate value, or for the possession of lands, appropriate writs of execution may issue for the satisfaction thereof."
The Committee Comments to Rule 69, A.R.Civ.P., entitled "Execution," states:
"The rule applies to all proceedings, whether heretofore regarded as legal or equitable, and it provides that a writ of execution shall be the normal process for enforcement of a money judgment."
*1202 The essential function of an execution is summarized in 30 Am.Jur.2d Executions § 1, at 445 (1967):
"Generally speaking, an execution is a remedy afforded by law for the enforcement of a judgment. It is the means by which a judgment is made effective. Its object is to obtain satisfaction of the judgment on which the writ is issued. Hence, an execution has been aptly termed `the fruit and end' of a lawsuit."
American courts have traditionally applied the fundamental principle that execution is separate and apart from the judgment:

"Execution or satisfaction is no part of the judgment. It is rather an entirely subsequent proceeding in the cause. ...."
Cahn v. Allen, 123 N.J.L. 126, 8 A.2d 67 (1939).
"The writ of execution is not the judgment. Its function is to make effective the prior judgment of the court."
National Discount Corp. v. O'Mell, 194 F.2d 452, 456 (6th Cir.1952).
Not only is the one concept no part of the other, but each is distinct from the other in character and nature, executions being adjective or procedural law and judgments being substantive law.
"Black's Law Dictionary defines the term `substantive law' as meaning that part of the law which creates, defines, and regulates rights, as opposed to `adjective' or `remedial' law, which prescribes the method of enforcing rights or obtaining redress for their invasion."
Ballentine's Law Dictionary, (2d ed. 1948).
"This theory [the defense of revivor] confuses substantive and procedural law. A writ of execution is not part of the judgment and must be distinguished from it.... It is a procedural device issued by a court to assist a successful litigant in obtaining the benefits of the judgment awarded to him. Its sole function is related to enforcing the judgment of the court."
Juneau Spruce Corp. v. International Longshoremen's & Warehousemen's Union, 128 F.Supp. 697, 705 (D.Hawaii 1955).
In 1 Freeman On Judgments § 2, p. 5 (1925), the author puts it this way:
"The reasons announced by the court to sustain its decision, and the award of execution to produce satisfaction, constitute no part of the judgment."
In 1 Freeman On Executions § 22, p. 41 (1900), the same author speaks of the interplay between judgments and executions:
"There are, however, some familiar instances in which the only effect of a judgment is to establish the existence of a liability against the defendant; and in which the plaintiff cannot issue execution, but must obtain satisfaction in some other manner provided by law."
The Law of Exemptions From Execution: The definition and purpose of exemptions are expressed in 31 Am.Jur.2d Exemptions § 1, at 329 (1967):
"An `exemption' ... may be defined as a right given by law to a debtor to retain a portion of his personal property free from seizure and sale by his creditors under judicial process. It is a privilegea mere grace or favor dependent on the will of the stategranted on grounds of public policy for a humane and generous purpose. When his debt is created, the creditor does not look, and has no right to look, to property so exempted as a means of payment. So long as the law exists by which the exemption is granted and secured, the right to enjoy the exemption should have the same protection from judicial tribunals that is accorded to any other right, for it is a positive, unqualified right, and one of equal dignity with other rights of property protected by the constitution from legislative or judicial invasion or diminution."
Both the federal and state governments have acted in the public interest to provide relief from execution against the debtor's property in certain circumstances. *1203 While our State Constitution mentions only exemptions from execution on contractual debts (Ala. Const. Art. X, § 204; see, also, U.S. Const., Art. 1, § 8), the United States Congress and the state legislatures have provided exemptions from judgments ex delicto, as well as ex contractu (e.g., 11 U.S.C. § 101 et seq.; and Ala.Code 1975, § 6-10-1 et seq.); and the courts have interpreted these laws liberally in favor of the debtor.
"We consider that the statute in question was also within legislative competency. The modification of sovereign immunity lies with the legislature, and allowing garnishment only upon judgments ex contractu where a governmental unit is garnishee is not unreasonable. On the contrary, protecting creditors' rights under judgments on contracts freely entered into preserves the constitutional prohibition against impairment of contracts, and is thus a legitimate end."
Knight v. Knight, 409 So.2d 432, 435-36 (Ala.Civ.App.1982) (allowing the writ of garnishment against a governmental employee on ex contractu judgment and upholding exemption from garnishment on ex delicto judgment, as provided in Ala. Code 1975, § 6-6-482).
As stated in Lasseter v. Lasseter, 266 Ala. 459, 461, 97 So.2d 555, 557 (1958) (a holding cited as authority in Knight, supra):
"[T]he clear provisions of [§ 6-6-482] exempt appellant's salary from the writ of garnishment issued in this cause. The result reached in the instant case is not that which we would have desired, but the remedy must lie with the legislature, not with the courts."
Without contest in the instant appeal, the Board properly invoked § 11-93-2 to seek and secure from the circuit court an order staying execution against the Board, upon its insurer's payment of the unexempt amount of $100,000. Unquestionably, either that procedure or the filing of a claim of exemption would have effectively protected the public treasury, as intended by the Act.
Before addressing the ultimate issue of St. Paul's contention that the trial court erred in not affording St. Paul the same protection as that afforded the Board, we conclude our discussion of Nowlin I's narrow holding with one further observation: St. Paul's contention, with respect to its contractual liability being limited to the same extent as the cap established by statute in favor of the Board, overlooks one of the most basic rules of statutory interpretation.

"A fundamental rule of statutory construction is, `If a statute is susceptible of two constructions, one of which is workable and fair and the other unworkable and unjust, the court will assume that the legislature intended that which is workable and fair.' State v. Calumet and Hecla Consol. Copper Co., 259 Ala. 225, 233-34, 66 So.2d 726, 731 (1953)."

Ex parte Hayes, 405 So.2d 366, 370 (Ala. 1981).
An interpretation of § 11-93-2 to the effect that it limits the judgment (or, more accurately, that it limits the obligation as determined by the judgment), rather than an interpretation that the statute is one of exemption from execution against the governmental entity the object of legislative protectionwould be entirely unworkable. Such an interpretation would have the unwitting effect of illegally reducing the liability of joint tort-feasors and abridging the contractual rights and obligations of third parties. Suppose the $500,000 judgment had been rendered against the Board and a nonprotected joint tort-feasor; surely, no one would argue that the defendant who falls outside the statutory protection is entitled to the same right of exemption against execution of the judgment as is the Board. The "single judgment" concept, mandated by the "nonapportionment of damages among joint tort-feasors" rule, was recently reaffirmed by this Court in Black Belt Wood Co. v. Sessions, 514 So.2d 1249 (Ala.1986).
*1204 Additionally, nothing in the statute abridges the City's right to expend public money to contract for its protection against any potential obligation that may exceed the statutory limit on execution and for the protection of members of the public, as third-party beneficiaries under the policy of insurance. Wisely, the legislature chose to avoid these problems, and to effectuate its intent, by couching the statute in terms of limiting the judgment creditor's right of recovery against the public treasury, thus providing a remedy of exemption from execution to the governmental entity, but not to other parties otherwise affected by the judgment.
In summary, then, all of these considerations combine to support Nowlin I's narrow holding that § 11-93-2's operative effect does not reduce the judgment from $500,000 to $100,000. Not only does the express language of the statute ("The recovery of damages under any judgment... shall be limited to $100,000") preclude a contrary holding, but the constraints of the law of judgments, the law of executions, and the law of exemptions from execution likewise preclude a contrary interpretation.
But Nowlin I does not answer the ultimate dispositive issue: Pursuant to the Board's exercise of its right to contract, did the policy of insurance procured by the Board from St. Paul provide coverage for the $400,000 excess? Given the finality of the $500,000 judgment, we look to the only legitimate sources for the answer: the language of the policy and the statutory language of § 27-23-2.
Under the insuring clause, St. Paul promised to pay on behalf of the Board "all sums which the insured shall become legally obligated to pay as damages." Under the third-party beneficiary clause, entitled "Action Against Company," the policy defines the term "legally obligated to pay" as follows:
"No action shall lie against the company,... until the amount of the insured's obligation to pay has been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant, and the company."
The final reference to coverage here pertinent is also found in the third-party beneficiary section of the policy, which provides:
"Any person ... who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy."
It is interesting to note that the policy's own definition of an "obligation to pay" a final judgmentis in the very words of the law of judgments, and the balance of the third-party provision virtually tracks the language of § 27-23-2. For this Court to interpret § 11-93-2 to limit the Board's "obligation to pay" to $100,000, and, therefore, St. Paul's obligation, would be violative not only of the law of judgments, but of the express provisions of the policy, which are artfully drafted in the language of the law of judgments and in the statutory language of § 27-23-2. This compatibility of language, of course, is not a mere coincidence; the language of St. Paul's policy was consciously and correctly drafted to comport with the provisions mandated by § 27-23-2.
St. Paul would have us conclude that § 11-93-2 removed the "obligation to pay" or that the Act limited not "recovery of damages under any judgment," but the judgment itself. The problem with this contention is the fact that the Act does not mention the "obligation to pay." Rather, the Act places a limitation on execution. Stated otherwise, the Act places a limit on "The right of recovery of damages under any judgment," which is a totally different thing from a limit on the "obligation to pay" as "finally determined... by judgment against the insured after actual trial"the protection afforded by the policy and mandated by the "satisfaction of the judgment" provisions of § 27-23-2.
*1205 Indeed, we have been cited to no case, and our independent research has revealed none, that equates a writ of execution with a judgment so that a statutory exemption from execution acts to reduce, satisfy, or extinguish the obligations of a judgment. For this Court to so hold would do violence to the exemption statute, as well as to the fundamental tenets of each of the three above-discussed traditional bodies of law, and would be contrary to the clear language of the "insuring" and "third-party enforcement" provisions of the policy of insurance.
St. Paul would have the Court construe its policy as if it provided: "St. Paul will pay all sums that the judgment creditor is entitled to collect from the insured under a final judgment." Not only is the policy not so worded, but, even if it were, it would violate the express mandate of § 27-23-2. Rather, it is the duty of the Court to construe the language of the policy, which is consistent with the "satisfaction of the judgment" statute, exactly as it reads:
"[An] action shall lie against the Company... [when] the amount of the insured's obligation to pay shall have been finally determined ... by a judgment....
"Any person ... who has secured such judgment shall thereafter be entitled to recover against this Policy to the extent of the insurance provided by this Policy...."
Moreover, a holding that limits the insurer's liability to the $100,000 statutory cap on the judgment creditor's right of recovery against the Board would be tantamount to a conversion of St. Paul's policy of casualty insurance to a contract of indemnity. Contracts of indemnity do not provide protection for third parties, and thus such contracts do not contain third-party beneficiary provisions.
Although the precise issue here presented has not been previously decided, the Court in Continental Auto Ins. Underwriters v. Menuskin, 222 Ala. 370, 132 So. 883 (1931), spoke to the legal effect of similar policy language:
"Prior to the enactment of section 8377, Code [1923], this court held that equity had no jurisdiction to provide relief in favor of an injured party against the insurer in a policy which provided indemnity for the assured against loss, but not against liability, and that by such policy the injured party had no equitable claim on the policy even after judgment against the insured and though the insurer managed the defense of the suit. [Citations omitted.]
"But the terms of the policy we have referred to in this case containing a direct promise to pay the judgment, make it an insurance against liability, rather than against loss. It does not require payment of the judgment as a condition to liability, but only the rendition of judgment. This is the interpretation given to such a policy by other courts, and we think there can be no substantial doubt as to its correctness. [Citations omitted.]"
222 Ala. at 372, 132 So. at 885.[3]
Justice Foster, who also authored Menuskin, speaking for the Court in Ohio Casualty Ins. Co. v. Gantt, 256 Ala. 262, 54 So.2d 595 (1951), stated:

"The controlling question, as we have shown, is not so much whether there was a `final judgment,' as mentioned in section 12, Title 28, Code, but whether there was due to be paid to the insured by the insurer a sum fixed by the judgment from which an appeal was taken. That is, to inquire whether after such appeal defendant in the judgment, the insured, could maintain a suit on the policy against appellant, insurer, as declared by the policy. For if he could, plaintiff acquired the statutory power in equity to reach that claim notwithstanding an appeal which did not suspend the right of plaintiff to pursue any course available *1206 to collect the amount of the judgment.

"There is no controversy that at the time this suit in equity was begun after the appeal, without supersedeas, there was an obligation of insured to pay plaintiff, which had been determined by judgment against him after trial.
"The question immediately before us is whether such a judgment, pending such appeal, `finally determined' the obligation within the terms of the policy. We are not at the moment concerned with the term `final judgment,' referred to in section 12, supra. But such judgment must be one presently collectible to be one finally determined by judgment. That can mean no more than a complete judgment which is then collectible by any and all means provided by law."
Ohio Casualty Ins. Co. v. Gantt, 256 Ala. at 267, 54 So.2d at 600. See, also, Maness v. Alabama Farm Bureau Mut. Cas. Ins. Co., 416 So.2d 979 (Ala.1982).
A holding contrary to the judgment appealed from would be violative of the mandate of § 27-23-2, which, consistent with the language of St. Paul's policy, prescribes the remedy available to third-party beneficiaries under a policy of casualty insurance.
For the reasons stated, the judgment of the trial court is affirmed.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING GRANTED; AFFIRMED AS TO THE APPEAL; DISMISSED AS TO THE CROSS-APPEAL.
In conclusion, I caution the reader that what you have just read may, and most likely someday will, be the law; but, as of now, it is a rejected "proposed opinion" and, thus, my respectful dissent.
ADAMS, Justice (dissenting from denial of application for rehearing).
Although I concur in the dissenting opinion of Justice Jones, I write separately to explain additional reasons why I believe the trial court's judgment is due to be affirmed. The insurance contract is ambiguous as to whether Nowlin can recover against St. Paul to the extent of coverage; therefore, I agree with the trial court's judgment allowing Nowlin to recover the full judgment, and, accordingly, I dissent.
Three statutes are important for our consideration. First, Ala.Code 1975, § 11-93-2, limits the judgment creditor's right of recovery of damages under any judgment against a governmental entity to $100,000 for bodily injury or death for one person in any single occurrence. Further, § 11-93-2 has been held not to limit the jury's right to fix damages at an amount in excess of $100,000. Nowlin v. Druid City Hosp. Bd., 475 So.2d 469 (Ala.1985) ("Nowlin I"), and Elmore County v. Ragona, [Ms.1989] 540 So.2d 720 (Ala.1989).
In other words, it does not affect the jurisdiction of the court to consider a claim for excess damages (more than $100,000) and to render judgment to the full extent of the damages claimed and proved. As a result, the statutory limit for which a municipality may be held liable in tort is not deemed a self-executing provision of the law that the trial court must apply whenever a public entity is sued for personal injury. 57 Am.Jur.2d Municipal, County, School, and State Tort Liability § 684 (1988).
Second, Ala.Code 1975, § 11-95-7(13), authorizes public hospital corporations to "provide for such insurance as the business of the corporation may require." And in Alabama, as correctly noted by the majority, "a governmental unit's immunity from tort liability is unaffected by its procurement of insurance which purports to protect it from such liability." Thompson v. Druid City Hospital Board, 279 Ala. 314, 315, 184 So.2d 825, 826 (1966). Thus, an entity's procuring insurance coverage does not constitute a waiver of immunity where governmental activities are concerned, which, in effect, would make the municipality liable in tort to the extent of the insurance. See C. Antieau, Municipal Corporation Law, § 12-23 (1988).
And, third, § 27-23-2, entitles a judgment creditor "to have the insurance money *1207 provided for in the contract of insurance between the insurer and the defendant applied to the satisfaction of the judgment, and if the judgment is not satisfied within 30 days after the date when it is entered, the judgment creditor may proceed against the defendant and the insurer to reach and apply the insurance money to the satisfaction of the judgment."
By reaffirming, however, that § 11-93-2 is non-jurisdictional, while not waiving immunity to the extent of insurance coverage, the majority leaves the issue of municipal tort liability unsettled and pursues a bright-line rule based on the facts of the instant case. In sum, what becomes of the judgment over and above $100,000? We have given the trial court free reign to enter judgment for more than $100,000, but we have told the trial court that it may not correctly reduce the judgment upon application of § 11-93-2. We must now tell Nowlin, the judgment creditor, why he cannot recover the judgment by application of the excess insurance coverage under § 27-23-2.
Other jurisdictions have addressed this problem. For example, in response to the plaintiff's assertion that the school district waived its protection under the Oregon damages limitation provision by purchasing liability insurance, the court in Espinosa v. Southern Pacific Transp. Co., 50 Or.App. 561, 624 P.2d 162, aff'd, 291 Or. 853, 635 P.2d 638 (1981), stated that because constitutional status was accorded to sovereign immunity in Oregon, such immunity could be waived only by the legislature, and had been waived by the state's Tort Claims Act only to the extent provided in the damages limitation provision.
Furthermore, the Oregon court continued, the "legislature's providing for the purchase of insurance by municipal corporations did not abrogate the damage limitation provision in light of express statutory language that `liability of any public body on claims arising out of a single accident or occurrence shall not exceed the [statutory maximum].' In any event, the court concluded, it would be absurd to ascribe to the legislature an intent to limit government's liability for damages and to simultaneously provide a means for judgment creditors to recover judgments in excess of such limits." As cited in 43 A.L.R.4th 19, "Government Tort Damages Statute" § 17 (1986).
To give life, however, to § 11-95-7(13) and § 27-23-2, the majority states that "[t]he law is clear that a judgment creditor's right under § 27-23-2 to proceed against the insurance company to satisfy a judgment obtained against the defendant/insured is dependent upon the rights of the insured against its insurer under the policy," and the majority indicates, by its examination of the insurance contract between St. Paul and the hospital board, that "[b]ecause the Board is not `legally obligated to pay' Nowlin more than $100,000 under § 11-93-2, St. Paul is not obligated under its contract with the Board to pay the $400,000 as ordered by the trial court."
The inference to be derived from this interplay between § 11-93-2 and the terms of the policy is that the majority is prepared to waive the provisions of the statute limiting the amount of damages recoverable against government tort-feasors to the extent of insurance coverage if an express provision to that effect is written into the particular insurance policy involved.
This result has been reached in other jurisdictions. For example, in Sambs v. City of Brookfield, 66 Wisc.2d 296, 224 N.W.2d 582 (1975), the court held that a municipality's purchase of liability insurance with policy limits far exceeding a statutory maximum of $25,000 recoverable against government tort-feasors "did not effect a waiver of the statutory limits where the municipality's policy contained no provision barring the parties from raising the defense of government immunity or from asserting the statutory liability limitation." The court stated in effect that it would not imply a waiver of statutory damage limits absent express language to that effect in the insurance contract, reasoning that to hold otherwise would be to invite a lack of uniformity of tort-damage limits throughout the state. 43 A.L.R.4th 19, "Government Tort Damages Statute," § 17 (1986).
*1208 Policy considerations support this construction. If the municipality pays the premiums for a certain level of coverage (as is its right under § 11-95-7(13)), and the insurer accepts the premiums for that coverage, the municipality's sense of justice that a party injured by the municipality should be compensated, and the insurer's duty to provide payment for the level of premiums accepted, should not be abrogated. See, generally, Appleman, Insurance Law and Practice § 9271, et seq. (1967). Further, to construe § 11-95-7(13), § 11-93-2, and § 27-23-2 otherwise would deprive the public of the benefit of a public expenditure.
Therefore, the insurance contract must be examined to determine whether the parties intended to waive the statutory damages limit. The contract in the instant case is, however, ambiguous as to whether this result can be reached from its terms. The majority construes the contract provision that "[t]he company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay" to mean that if the hospital board is legally obligated to pay $100,000, St. Paul is obligated only to that extent. Ignored, however, is the contract provision that states that no action shall lie against the insurer until "the amount of the Insured's obligation to pay" is determined by "judgment," and that any person who has secured a judgment "shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy." (Emphasis added.)
By allowing the holder of the judgment to recover against the insured "to the extent of the insurance afforded" by the policy (in light of the contract's definition of "legal obligation to pay" as a "final judgment"), does the contract prohibit setting up the statutory limitation as a bar to recovery against the insurer and waive immunity to the extent of coverage? Or, does the contract of the insurer to pay all sums which the insured becomes "legally obligated to pay" limit the insurer's liability to the statutory limitation without waiving the insured's retained immunity? The insurance contract is ambiguous on these points and, in accordance with settled law, such an ambiguous provision is to be construed most strongly against the insurer. See McGuire v. Wilson, 372 So.2d 1297 (Ala.1979).
Construing the provisions of the contract most strongly against St. Paul, I believe that the contract prohibited the parties from asserting the statutory liability limitation to bar recovery to the extent of coverage. Although this definition is not explored in the majority opinion, the insurance contract defines "legal obligation to pay" as a "final judgment"; the majority impliedly recognizes waiver of the statutory limit of § 11-93-2 by contract, and the contract does not state that its provisions are limited by or subject to municipal immunity; and the policy was written and premiums accepted for a level of coverage far in excess of the statutory limit. Therefore, Nowlin is entitled to full recovery of the judgment by application of the excess insurance coverage.
NOTES
[1] Ala.Code 1975, § 11-93-2, provides:

"The recovery of damages under any judgment against a governmental entity shall be limited to $100,000.00 for bodily injury or death for one person in any single occurrence. Recovery of damages under any judgment or judgments against a governmental entity shall be limited to $300,000.00 in the aggregate where more than two persons have claims or judgments on account of bodily injury or death arising out of any single occurrence. Recovery of damages under any judgment against a governmental entity shall be limited to $100,000.00 for damage or loss of property arising out of any single occurrence. No governmental entity shall settle or compromise any claim for bodily injury, death or property damage in excess of the amounts hereinabove set forth."
[2] Ala.Code 1975, § 27-23-2, provides:

"Upon recovery of a final judgment against any person, firm or corporation by any person, including administrators or executors, for loss or damage on account of bodily injury, or death or for loss or damage to property, if the defendant in such action was insured against the loss or damage at the time when the right of action arose, the judgment creditor shall be entitled to have the insurance money provided for in the contract of insurance between the insurer and the defendant applied to the satisfaction of the judgment, and if the judgment is not satisfied within 30 days after the date when it is entered, the judgment creditor may proceed against the defendant and the insurer to reach and apply the insurance money to the satisfaction of the judgment."
[1] This concession also eliminates the contention on cross-appeal that the trial court erred in holding that St. Paul's payment of the statutory cap of $100,000 (§ 11-93-2) barred any further recovery against the Board, thus leaving St. Paul's liability for the $400,000 balance as the only remaining issue.
[2] Lorence v. Hospital Board of Morgan County, 294 Ala. 614, 320 So.2d 631 (1975); and Jackson v. City of Florence, 294 Ala. 592, 320 So.2d 68 (1975).
[3] The distinction between an equitable and a legal claim was abolished by the 1971 amendment to § 27-23-2, the successor statute to Code 1923, § 8377.