810 So.2d 667 (2001)
CITY OF BIRMINGHAM
v.
William Fred HORN et al.
William Fred Horn et al.
v.
City of Birmingham et al.
1991455 and 1991558.
Supreme Court of Alabama.
August 17, 2001.
*670 Joe R. Whatley, Jr., and Peter H. Burke of Whatley Drake, L.L.C., Birmingham; Kenneth L. Thomas and Valerie L. Acoff of Thomas, Means & Gillis, Birmingham; and Tamara Harris Johnson and Michael Melton, city attys., for appellant/cross appellee City of Birmingham.
W.L. Williams, Jr., Birmingham; and David A. Sullivan, Birmingham, for appellees/cross appellants William Fred Horn et al.
Kenneth Smith, director of legal services, and Erin Smith, assoc. gen. counsel, Alabama League of Municipalities for amicus curiae Alabama League of Municipalities.
BROWN, Justice.
The question presented in these appeals, collectively stated, is whether the Jefferson Circuit Court erred by holding that a group of citizens (sometimes referred to herein as "the plaintiffs") who sued the City of Birmingham ("the City") are entitled to an award of attorney fees totaling $1,785,939, an amount computed by the socalled "lodestar method." The court awarded these fees to the plaintiffs for their role in litigation involving the placement of a waste transfer station and recycling center in a Birmingham neighborhood by Browning Ferris Industries of Alabama, Inc. ("BFI"). See generally Horn v. City of Birmingham, 648 So.2d 607 (Ala.Civ.App.1994) ("Horn I"); Horn v. City of Birmingham, 718 So.2d 691 (Ala.Civ.App.1997) ("Horn II"); and Battle v. City of Birmingham, 656 So.2d 344 (Ala.1995). The City appeals, contending that the trial court, in awarding attorney *671 fees, incorrectly applied the method it used to compute the fees; the plaintiffs cross-appeal from the order awarding attorney fees, contending that the trial court used an inappropriate method to compute the fees. As to the City's appeal, we reverse the judgment of the trial court and render a judgment; as to the plaintiffs' cross-appeal, we affirm.

I. Facts and Procedural History

To facilitate an understanding of this complex case and the stakes involved, we set out its factual background, in pertinent part, as it was previously presented by this Court in Ex parte Horn, 718 So.2d 694 (Ala.1998):
"Browning Ferris Industries of Alabama, Inc. (`BFI'), operates landfills for sanitary waste (hereinafter sometimes referred to as `garbage') in Blount and Walker Counties that are permitted to accept such waste from certain other Alabama counties, including Jefferson County. In 1991, BFI sought to construct a sanitary waste transfer station and recycling center in the City of Birmingham (`the City'). The sanitary waste transfer station was to be a facility where the many BFI trucks collecting garbage from areas of the City would come and dump their loads of garbage inside a large building; the garbage would then be processed by separating recyclable waste from nonrecyclable waste. The nonrecyclable waste would later be transferred to much larger trucks for transport to distant landfills, and the recyclable waste would be stored on-site for eventual sale.
"In January 1991, an attorney representing BFI wrote a letter to Tom Magee, chief planner in the City's Department of Urban Planning, inquiring whether BFI's proposed sanitary waste transfer station and recycling center would require a `special use' zoning permit. The BFI letter stated, in relevant part:
"`It is BFI's intention to purchase property near the University of Alabama [at] Birmingham. The facility that they wish to locate there is called a Transfer and Recycling Facility. The purpose of the operation is this:
"`BFI trucks will deliver garbage and recyclable materials to the facility. A machine will then separate the garbage from the recyclable materials. All the recyclable materials will be placed in the facility and sold to the market as BFI chooses, and all the garbage will be compressed by a machine and then placed on 70 ton trucks. After this process is completed the 70 ton trucks will deliver the compressed garbage to landfill sites in Blount and Walker Counties.
"`As you know, the zoning ordinance under the special exception criteria, authorize[s] a landfill in an M2 ["heavy industrial"] district with a special use permit. My question to you is whether a facility, such as the one described above, is deemed to be a landfill by the City of Birmingham.'
"The City's use regulations for a district zoned M-2, heavy industrial, state:
"`A building or premises shall be used only for the following purposes:
"`1. Any use permitted in the M-1 Light Industrial District; except, that no dwelling other than that for a resident watchman, custodian or caretaker employed on the premises shall be permitted.
"`2. Any other use not in conflict with the ordinances of the City of Birmingham regulating nuisances; provided further that no building or occupancy permit shall be issued for any of the following uses until and unless the location of such use shall *672 have been approved by the City Council after report by the Planning Commission in accordance with the procedure set forth in Article V, Section 3:
"`a. Abattoir.
"`b. Acid manufacture.
"`c. Atomic power plant or reactor.
"`d. Explosives manufacture or storage.
"`e. Fat, grease, lard or tallow rendering or refining.
"`f. Glue or size manufacture.
"`g. Garbage, offal or dead animal reduction or dumping.
"`h. Petroleum refining.
"`i. Stockyard or slaughter of animals.
"`j. Junkyards, salvage yards.
"`k. Hazardous waste or toxic disposal.
"`l. Medical and infectious materials disposed.'
"[Emphasis added in Ex parte Horn omitted here.] The City's M-1 use regulation allows, among other things, `Manufacturing, fabricating, processing, or assembling uses which do not create an objectionable noise, vibration, smoke, dust, odor, heat or glare.' (Emphasis added [in Ex parte Horn].)
"Later that same month, Magee wrote a response to BFI, stating that it was his opinion that BFI did not need to obtain a special use permit to construct a sanitary waste transfer and recycling facility in an M-2 district:
"`This letter is in response to your recent correspondence regarding Browning Ferris Industries' (BFI) intent to purchase property on the Southside of Birmingham for the purpose of constructing a Transfer and Recycling Facility. As per your letter, BFI trucks will deliver garbage and recyclable materials to this proposed facility, where the garbage and recyclable materials will be separated. All garbage will then be compressed and placed in 22[sic] ton trucks which will haul the garbage to landfills in Blount and Walker Counties. It is my understanding that the garbage will be processed daily and will not remain on the premises overnight. Your letter also indicated that the recyclable materials will be stored in a separate area and will be sold to the market as needed. It is also my understanding that this entire process of transferring, processing, and recycling of garbage will be completely enclosed within a building, and no hazardous wastes or toxic materials will be processed or stored on the premises. Based on this understanding, this use would not be interpreted to be a sanitary landfill. In addition, the property you have indicated as being utilized for this proposed facility is located north of 6th Avenue, South near the Golden Flake Company and is zoned M-2 (Heavy Industrial District). This Zoning district would allow this facility as a permitted use. Please be advised, however, that no noxious odors, fumes, or noise can be associated with this facility.'
"[Emphasis added in Ex parte Horn omitted here.] At the time Magee wrote this letter, the only knowledge or information he had regarding sanitary waste transfer stations was that presented in BFI's letter to him and in a videotape he had also received from BFI. Magee failed to conduct any further inquiry before providing BFI with his response approving construction of the facility in that M-2 district.

*673 "Thereafter, BFI obtained an option from the Golden Flake Company to purchase 10 acres of a 30-acre tract owned by Golden Flake, and BFI submitted for Golden Flake an application with the City to subdivide the property. In March 1992, BFI gave property owners immediately adjacent to the Golden Flake property notice of the intended subdivision of the property for development by BFI as a sanitary waste transfer and recycling station and the City approved subdivision of the property. BFI purchased the subdivided property from Golden Flake in March 1993 and in April BFI announced in a press release that it had obtained all the permits and approvals required by the City for it to construct a garbage transfer station in the Titusville area of Birmingham.
"The residents of the primarily African-American Titusville neighborhood first learned of the BFI sanitary waste transfer station through the press release. They objected to the facility's being built adjacent to their neighborhood, and several residents obtained the assistance of attorneys W.L. Williams, Jr., and David A. Sullivan [plaintiffs' counsel in the present appeal]. These Titusville residents and their legal counsel attended the May 11, 1993, meeting of the Birmingham City Council and voiced to the council members their objections to the proposed BFI facility. Council members responded by saying that they had not previously been aware of the pending BFI facility and that they did not believe they could do anything to prevent the completion of its construction. A larger group of Titusville residents, along with residents of Walker County, attended the May 25, 1993, meeting of the city council. During that meeting, the Titusville residents and their counsel voiced continued opposition to the BFI sanitary waste transfer station. Attorney Williams stated that he believed that under the City's M-2 zoning classification a facility such as the one BFI planned to construct required approval by the city council, and he requested that the Department of Urban Planning review the zoning ordinance again. Michael Dobbins, who was director of the Department of Urban Planning and was Magee's supervisor, stated that he believed council approval was not necessary, because he believed the BFI sanitary waste transfer station conformed with the M-2 heavy industrial zoning classification. Dobbins admitted that he had not visited a BFI sanitary waste transfer facility, but stated that if the proposed BFI facility involved the creation of noxious odors, fumes, and/or noise then it would violate the City's nuisance ordinances. Mayor Richard Arrington made a report to the council and informed it that he believed he had no legal basis to deny any further permits to BFI. However, the city council passed a resolution asking the mayor to have the City do whatever was legally possible to prevent BFI from operating a sanitary waste transfer station at the site in question. The following day the City's attorney issued a memorandum to the city council stating that he believed the City could face a multi-million dollar lawsuit if it prevented BFI from completing construction of the sanitary waste transfer station.
"Thereafter, Dobbins wrote a letter to Williams, one of the attorneys for the Titusville residents. Dobbins stated that it was his position that BFI's proposed facility was not a garbage dump and that BFI was not required to receive any further zoning approvals before construction of the facility. It is apparent from Dobbins's letter that he was taking as fact BFI's contention that *674 the garbage transfer station would not create any noise, noxious odors, or fumes that would prevent it from conforming with the M-2 use regulations and thus would not require city council approval. Dobbins stated in his letter to Williams that garbage transfer stations were a new method for handling household wastes and that the nearest one was being operated by BFI in Marietta, Georgia, where it was adjacent to a residential neighborhood. However, there is no indication in the record that Dobbins or any of his staff had visited the Marietta garbage transfer station, or any other operated by BFI, in order to ascertain whether such facilities created noise, noxious odors, or fumes, or in any other way would constitute a nuisance. Also in May 1993, Mayor Arrington wrote to the city council, stating that after consulting with the City's Law Department and the Department of Urban Planning, he was of the opinion that construction permits could not be legally withheld from BFI.
"In early June 1993, the Titusville residents appealed Dobbins's decisionthat the proposed BFI garbage transfer station did not require approval by the city council in order to be constructed in an area zoned M-2to the City's Board of Zoning Adjustment (`the Board'). The construction of the BFI facility adjacent to a residential neighborhood, and the protest of the Titusville residents, had begun to attract substantial attention from the local news media, and at the June 8, 1993, meeting of the city council, one of the council members responded by sponsoring a proposed ordinance that would regulate sanitary waste transfer facilities and would require public notice and public hearings, as well as city council approval, before construction. The ordinance was adopted by the council at the same meeting and was approved by the mayor the following day; however, public notice requirements for approval of the ordinance had not been met and it had to be passed again at a later date, as mentioned below.
"The Titusville residents and their counsel, along with numerous supporters, appeared before the Board of Zoning Adjustment on June 10, 1993, to support their appeal; however, the Board upheld Dobbins's decision. Thereafter, on June 24, William Fred Horn and other citizens filed in the Jefferson Circuit Court a `Notice of Appeal of the Decision of the Zoning Board of Adjustment of the City of Birmingham and Complaint for Declaratory Judgment, Petition for Writ of Mandamus and Permanent Injunctive Relief' against the Board, the City, and the mayor (`the Horn lawsuit'). The Horn filing alleged that Dobbins, as the director of the Department of Urban Planning, was the only person lawfully authorized to administer the City's zoning ordinances and, therefore, that a lesser employee such as Magee was without lawful authority to render an interpretation of the M-2 zoning ordinance when he did so in his January 1991 letter to BFI. The filing further alleged that the construction permits the City had issued to BFI, based on Magee's decision and without city council approval, were unlawful. It requested that the court order the City not to issue any further permits to BFI regarding the facility under construction until its use was approved by the city council. In July 1993, 63 persons from different cities and counties in Alabama moved to intervene as plaintiffs in the Horn lawsuit. BFI also moved to intervene in the action as a defendant.
"In response to extensive and continuing public pressure and media coverage *675 brought by the plaintiffs' litigation against the City, the city council, on August 3, 1993, passed a resolution authorizing the mayor to enter into negotiations with BFI to either purchase the subject property from BFI or to exchange it for other property owned by the City. The mayor and a council member met with representatives of BFI to discuss a purchase of the property by the City, but no agreement was reached and BFI continued construction of the facility.
"On August 27, the plaintiffs filed a motion seeking to compel the City and the mayor to be realigned from defendants to plaintiffs. Negotiations between the City and BFI continued, but failed when the City could not meet BFI's requested price for the facility, $17 million. On September 3, the mayor filed a motion with the circuit court requesting that he be realigned from a party defendant to a party plaintiff, which was granted by the circuit court. That motion stated:
"`Now comes Mayor Richard Arrington, Jr. in his official capacity as Mayor of the City of Birmingham, Alabama, and moves this Honorable Court to realign this defendant as a plaintiff as further described herein. This defendant asserts that new information has been developed during the course of this action. This new information is as follows:
"`1. Contrary to earlier representations, a portion of the garbage collected by Browning-Ferris Industries of Alabama, Inc., will remain on the site more than a few hours. This consists of items salvaged for recycling and of liquid and semi-solid contaminants leaking from the garbage.
"`2. Contrary to earlier representations, this facility, if operated as other similar facilities, cannot be sanitized. Reports from Marietta, Georgia suggested that, with 24 hour operation, full, daily cleaning is either not possible or not effective in eliminating odor.
"`3. It has been reported to me that it is not possible to eliminate possible contaminated liquid drainage on streets and into storm sewers, leading to the facility. This is a special concern since the primary path to the BFI facility is adjacent to a city park and swimming pool.
"`4. Together with the additional information now available, as described herein, in my opinion, this garbage transfer facility does constitute a necessary incident to a garbage dump thereby incurring the requirement that the location of such use be approved by the City Council.
"`5. As a further necessary precondition to the operation of this facility, it is my opinion that the Alabama Department of Environmental Management must review and approve this facility as a necessary incident to a garbage dump. Any such review or approval is unknown to me.
"`Based upon these facts, I as Mayor, request to be realigned as a plaintiff for the limited purpose of asserting that, based on new information not previously furnished to, or incorrectly furnished to, Mr. Thomas Magee, Mr. Mike Dobbins, and the Zoning Board of Adjustment, this matter must, in accordance with Article III, Section 3.2 of the Zoning Code of the City of Birmingham, be referred to the Birmingham *676 Planning Commission and City Council, and further, that this proposed use, for reasons cited above, will, in my opinion, necessarily constitute a nuisance in violation of Section 11-8-1 of the General Code of the City of Birmingham, 1980, in that this use is likely to be prejudicial to the comfort of and offensive to the senses of the ordinary citizens of the City of Birmingham.'
"[Emphasis added in Ex parte Horn omitted here.]
"On September 7, the city council adopted a resolution authorizing the mayor to obtain an appraisal of the BFI property for the purpose of condemning the property. The council also authorized the creation of a committee to investigate the BFI project. BFI responded by suing the City, Mayor Arrington, the city council, and its members, for declaratory and injunctive relief, and for $17 million in damages (`the BFI lawsuit'). In its complaint, BFI alleged that City officials, unfairly exercising political expediency, had illegally conspired to formulate a plan to `kill' its previously approved project.
"On September 10, the City made an offer of judgment, per Rule 68, Ala. R. Civ. P., consenting to the entry of a judgment against it and in favor of the plaintiffs in the Horn lawsuit that would require that the matter of BFI's construction permits be returned to the city council for further consideration, requiring council approval before the facility could begin operating. The plaintiffs accepted the offer of judgment. On September 13, 1993, Judge William A. Jackson, of the Jefferson Circuit Court, entered a final order in the Horn lawsuit, pursuant to the offer of judgment, requiring that the City refuse to issue construction permits to BFI until the sanitary waste transfer facility obtained the approval of the city council, after public notice and a public hearing. The court ordered that each party bear its own costs. Two days later, the plaintiffs filed a Rule 59, Ala. R. Civ. P., motion with the circuit court, asking the court to alter or amend the judgment so as to award them an attorney fee from the City. The trial court denied the motion and the plaintiffs appealed to the Court of Civil Appeals; that court eventually affirmed the trial court's ruling....
"On September 14, the city council adopted an amended version of the solid waste facilities ordinance it had previously adopted in June. That extensive ordinance, governing the permitting and licensing of all commercial solid waste facilities in the City, now appears as § 4-3-31 et seq., General Code of the City of Birmingham....
"On September 17, the City's attorney wrote BFI a letter in which he invited BFI to petition the City for a special use zoning permit from the Board of Zoning Adjustment, as required by the trial court's judgment in the Horn lawsuit. However, BFI never did so. Instead, BFI attempted to use its own lawsuit against the City to gain approval to operate its garbage transfer station. The City responded to BFI's complaint against it by asserting the Horn lawsuit consent judgment in support of a collateral estoppel and res judicata defense.
"On January 13, 1994, Whitlynn Battle, one of the Titusville plaintiffs, moved to intervene in the BFI lawsuit against the City, as a party defendant. Battle sought to protect the judgment she and the other plaintiffs had obtained in the Horn lawsuit. The City, BFI, and Battle entered into mediation, and the BFI lawsuit was eventually settled, with a consent judgment entered in February *677 1994; by that settlement BFI was to sell, and the City was to purchase, BFI's property for $6,750,000. Battle, seeking to prevent the City from having to purchase the property from BFI, challenged the judgment by way of a Rule 59, Ala. R. Civ. P., motion and also sought an award of attorney fees in relation to the BFI lawsuit. The trial court denied the motions, and its ruling was eventually upheld on appeal. Battle, supra.
"The success of the Horn plaintiffs in preventing the operation of BFI's sanitary waste transfer station, and the City's purchase of the BFI property, [were] brought to statewide and even international attention. According to the plaintiffs, a Birmingham daily newspaper, the Birmingham News, published more than 90 articles concerning the plaintiffs' fight against the proposed BFI garbage transfer facility, and one Birmingham television station aired approximately 100 stories on that topic. The case was the focus of discussion on the Alabama Public Television Network's news program `For the Record' on November 28, 1995, and the international organization Greenpeace produced a video on the struggle of the Horn plaintiffs entitled, `Not in Anyone's Backyardthe Grassroots Victory over Browning-Ferris Industries.' On the episode of `For the [Record],' Rick Losa, a BFI representative, stated that because of the Horn litigation involving its attempt to operate a garbage transfer station in Titusville, BFI had changed its procedures for locating and constructing such a facility so that in the future public concerns about a proposed location would be considered from the start. The Horn lawsuit was also the topic of one of the 11 chapters in the 1995 academic text `Faces of Environmental Racism' by Dr. Laura Westra and Dr. Peter Wenz, in which those authors concluded that BFI's attempt to locate its garbage transfer facility in the primarily African-American Titusville neighborhood was a clear case of environmental racism."
Ex parte Horn, 718 So.2d at 695-701 (footnotes omitted).
The Horn plaintiffs appealed the trial court's order denying their motion for an award of attorney fees to the Court of Civil Appeals. That court, in Horn v. City of Birmingham, 648 So.2d 607 (Ala.Civ. App.1994), stated that it appeared the trial court's ruling had been based on "an apparent belief that a common fund had to exist in order for it to award attorney fees." Horn I, 648 So.2d at 609. The court then held that "the mere fact that the plaintiffs' action did not create a fund from which a fee could be paid should not bar the trial court from awarding attorney fees," and it remanded the case for the trial court to determine "whether the efforts of the plaintiffs' attorneys produced a common benefit [to the general public] and to consider the award of attorney fees." Id. at 610.
The trial court, on remand, determined that there was no common benefit to the general public and again denied the plaintiffs' motion for attorney fees. On return from remand, the Court of Civil Appeals affirmed. Horn v. City of Birmingham, 718 So.2d 691, 694 (Ala.Civ.App.1997). This Court then granted certiorari review to consider "whether the Court of Civil Appeals erred in affirming the trial court's ruling that the plaintiffs are not due an award of attorney fees under the `common benefit' exception to the `American Rule.'" Ex parte Horn, 718 So.2d 694, 695 (Ala. 1998) (sometimes referred to herein as "Horn III"). We reversed the judgment of the Court of Civil Appeals, holding that the plaintiffs were entitled to attorney fees *678 because they had conferred a substantial benefit upon the residents of Birmingham, including those residents living outside the plaintiffs' own neighborhood. Horn III, 718 So.2d at 706. In so holding, we reasoned that the benefit conferred included "a new [city] ordinance specifically regulating and licensing solid waste facilities, such as the garbage transfer station at issue... [and] an increased level of due process protection to all residents of Birmingham." Id. Consequently, the case eventually returned to the Jefferson Circuit Court for further proceedings.
In those proceedings, both parties initiated discovery relating to the question of attorney fees. While discovery continued, the plaintiffs filed a motion with the trial court seeking, among other things, interim attorney fees. The trial court granted the motion and eventually awarded the plaintiffs a $250,000 interim fee, prompting the City to petition this Court for a writ of mandamus. See Ex parte City of Birmingham, 757 So.2d 389 (Ala.1999). In that petition, the City requested that this Court (1) direct the trial court to vacate its order awarding the plaintiffs the $250,000 interim attorney fee and (2) overrule Horn III, supra. We denied the petition and held that the trial court did not abuse its discretion in awarding the interim attorney fee. Ex parte City of Birmingham, 757 So.2d at 392. We also refused to overrule our prior decision holding that attorney fees should be awarded in the case; we stated:
"The City requests further that we overturn our decision in Ex parte Horn,... in which we held that the residents are entitled to an attorney fee under the `common-fund' exception. However, we decline to do so."
Id.
In December 1998, the trial court conducted a bench trial on the issue of determining an award of attorney fees. The court heard from numerous witnesses, including the support staff for the plaintiffs' counsel; expert witnesses; the Honorable Richard Arrington, Jr. (who was mayor of Birmingham during the time in question); and plaintiff and defense counsel. The court received into evidence billing records; time sheets; invoices; expense reports; examples of work product; newspaper articles concerning the case; correspondence; and documents concerning the qualifications and professional achievements of plaintiffs' counsel.
After considering this evidence, the trial court issued an order on March 2, 2000, stating its findings and conclusions. In that order, the court deducted 84 hours from plaintiffs' counsel's billable-hour submission, finding those hours redundant or unnecessary; this yielded a total of 5,326 compensable hours. The court then considered and added hours claimed in the plaintiffs' counsel's supplemental submission, which raised the total compensable hours to 5,816.95. The court also determined a market rate of $175 per hour of work done, a figure it based on its considering evidence of rates charged in the area for similar work by attorneys with similar experience. Further, the court determined that the plaintiffs were entitled to a multiplier of 2, which, the court said, reflected the difficulty of the case and the fact that the plaintiffs had prevailed under arduous circumstances. The final attorney-fee award was $1,785,939, which reflected a deduction of $250,000 for the previously awarded interim attorney fees.
Neither side was content with this award. The plaintiffs moved the trial court to alter, amend, or vacate its judgment, contending that the court had erred by using the lodestar method in calculating *679 the fees. After the trial court denied the plaintiffs' motion, both sides appealed.
Resolution of the general issue in this case, as we stated it above, requires us to answer three questions: (1) Was the trial court correct in using the lodestar method for its calculation of attorney fees? (2) Did the trial court correctly determine that the plaintiffs were entitled to attorney fees totaling $1,785,939 and that those fees were necessary and reasonable? and (3) Does § 11-93-2, Ala.Code 1975, limit the City's obligation to pay attorney fees exceeding $300,000?

II.
The first question we consider is whether the trial court used the correct method for its calculation of attorney fees. The plaintiffs contend that under the law-of-the-case doctrine, the trial court should have used the "percentage method," which, the plaintiffs argue, would have been in accordance with our holding in Horn III.
In Gray v. Reynolds, 553 So.2d 79 (Ala.1989), we summarized the law-of-the-case doctrine:
"It is well established that on remand the issues decided by an appellate court become the `law of the case,' and that the trial court must comply with the appellate court's mandate. Walker v. Carolina Mills Lumber Co., 441 So.2d 980 (Ala.Civ.App.1983). See also Erbe v. Eady, 447 So.2d 778 (Ala.Civ.App.1984). The trial court's duty is to comply with the mandate `according to its true intent and meaning,' as determined by the directions given by the reviewing court. Ex parte Alabama Power Co., 431 So.2d 151 (Ala.1983)."
553 So.2d at 81. The application of this doctrine here rests upon a construction of our holding in Horn III, for only those statements of law directly pertaining to the issues decided in Horn III can bind subsequent proceedings in this case. See Gray, 553 So.2d at 81.
The plaintiffs contend that Horn III is dispositive of the question regarding the appropriate method to be employed in calculating the award of attorney fees in this case. In Horn III, the issue before us was whether the plaintiffs were entitled to attorney fees. 718 So.2d at 695. We observed that, under the American rule, parties to a lawsuit generally bear the responsibility of paying their own attorney fees, subject to certain exceptions created by statute, contract, or "special equity." Id. at 702. We then held that the special-equity exception applied to this case. Id.
The special-equity exception invokes principles common to an action seeking a recovery under the theory of quantum meruit, in that it involves one party's seeking compensation for engaging in efforts that benefited another party. Silberman v. Bogle, 683 F.2d 62, 64 (3d Cir.1982) (quoting Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 165 (3d Cir.1973)). We acknowledged those principles in Horn III, where we stated:
"[A]ttorney fees may be awarded where the plaintiff's efforts are successful in creating a fund out of which the fees may be paid, or when the efforts of the plaintiff's attorneys render a public service or result in a benefit to the general public in addition to serving the interests of the plaintiff."
718 So.2d at 702; see also City of Ozark v. Trawick, 604 So.2d 360, 364 (Ala.1992); Brown v. State, 565 So.2d 585, 591 (Ala. 1990); and Bell v. Birmingham News Co., 576 So.2d 669, 670 (Ala.Civ.App.1991). In Horn III, we found that the plaintiffs' efforts had principally resulted in a new City ordinance regulating solid-waste facilities; this fact, we said, resulted in an *680 increase in due-process protection for all residents of Birmingham. Horn III, 718 So.2d at 706. We then held that the plaintiffs were entitled to an award of attorney fees under the special-equity exception. Id. The plaintiffs, noting that this exception is premised upon the common-benefit doctrine, argue in their brief that our holding in Horn III issued an implied mandate to the trial court to employ the so-called "common-fund" approach in calculating the award of attorney fees in this case. We disagree.
Under Alabama law, there are currently two methods available for the determination of fee awards for attorneys who have litigated successfully on behalf of a class: (1) the common-fund approach and (2) the lodestar approach. See Union Fid. Life Ins. Co. v. McCurdy, 781 So.2d 186, 189-90 (Ala.2000) (discussing the discretion of the trial court in determining which approach is appropriate in any given case). Under the lodestar approach, the trial court must determine the number of hours reasonably expended by counsel on the matter, and then multiply those hours by an hourly rate of compensation set by the court. Union Fid., 781 So.2d at 191-92. The court may then adjust that figure by using a multiplier determined by considering a variety of factors, including the complexity of the case and counsel's experience. Id. Under the common-fund approach, the trial court decides upon a percentage and then applies that figure to the fund obtained as a recovery. Although we have held that the existence of a separate fund is unnecessary, Union Fid., 781 So.2d at 190, we have employed the common-fund approach only when there has been a defined monetary recovery. See Edelman & Combs v. Law, 663 So.2d 957, 961 (Ala. 1995); Ex parte Brown, 562 So.2d 485, 496 (Ala.1990); Reynolds v. First Alabama Bank of Montgomery, N.A, 471 So.2d 1238, 1245 (Ala.1985); and Eagerton v. Williams, 433 So.2d 436, 450-51 (Ala. 1983); cf. Union Fid., 781 So.2d at 189-90 (stating that recovery under the common-fund approach is possible when the defendant has admitted to being liable for a sum certain in damages even though no separate fund, such as an escrow account, has been created).
The common-fund approach becomes unworkable when the recovery does not involve a quantifiable monetary settlement or damages award. This is often the case where, as here, the litigation has been undertaken solely to effect a societal change. Generally, such a case involves the declaration or enforcement of rights where a statute authorizing the lawsuit has likewise authorized the award of attorney fees. See Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 255 (1985). Because of the intangible nature of the relief granted, courts have steadfastly employed the lodestar method to calculate attorney fees in such cases. The United States Court of Appeals for the Third Circuit, in In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768 (3d Cir.1995), explained the judicial loyalty to the lodestar method in this kind of case:
"The lodestar and the percentage of recovery methods each have distinct attributes suiting them to particular types of cases. Ordinarily, a court making or approving a fee award should determine what sort of action the court is adjudicating and then primarily rely on the corresponding method of awarding fees (though there is, as we have noted, an advantage to using the alternative method to double check the fee).
"Courts generally' regard the lodestar method, which uses the number of hours reasonably expended as its starting point, as the appropriate method in statutory *681 fee shifting cases. Because the lodestar award is de-coupled from the class recovery, the lodestar assures counsel undertaking socially beneficial litigation (as legislatively identified by the statutory fee shifting provision) an adequate fee irrespective of the monetary value of the final relief achieved for the class.
"This de-coupling has the added benefit of avoiding subjective evaluations of the monetary worth of the intangible rights often litigated in civil rights actions. Outside the pure statutory fee case, the lodestar rationale has appeal where as here, the nature of the settlement evades the precise evaluation needed for the percentage of recovery method."
55 F.3d at 821 (citation omitted). With regard to cases (like the present one) where the right to an attorney fee is non-statutory and the relief involves intangible remedies, the Court of Appeals in General Motors opined:
"Certainly, the court may select the lodestar method in some non-statutory fee cases where it can calculate the relevant parameters (hours expended and hourly rate) more easily than it can determine a suitable percentage to award."
Id.
The Third Circuit's reasoning in General Motors illustrates the principle that the method used to calculate an attorney-fee award in a particular case is not necessarily determined by which of the exceptions (i.e., statutory, contractual, or special equity) justified that award. Consequently, attorney fees awarded pursuant to the "special-equity" common-benefit doctrine may, at times, be computed using the lodestar method where circumstances warrant. See Charles v. Goodyear Tire & Rubber Co., 976 F.Supp. 321, 325 (D.N.J. 1997) (applying the lodestar method after noting the difficulty in valuing a settlement that included equitable relief); and Cooperstock v. Pennwalt Corp., 820 F.Supp. 921, 926 (E.D.Pa.1993) (applying the lodestar method after finding that the benefit conferred upon the class plaintiffs was "unquantifiable"). In Horn III, this Court determined that the plaintiffs were entitled to attorney fees, but, by its silence on the question of method, left open the method by which those fees were to be calculated. Therefore, we hold that the trial court did not violate the law of the case established in Horn III by employing the lodestar method.[1]

III.
We now turn to the question regarding the amount of attorney fees awarded. "The determination of whether an attorney fee is reasonable is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion." Ex parte Edwards, 601 So.2d 82, 85 (Ala.1992). Our *682 deference to the trial court in attorney-fee cases is based upon our recognition that the trial court, which has presided over the entire litigation, has a superior understanding of the factual questions that must be resolved in fee determinations. See Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Nevertheless, the trial court's order regarding an attorney fee must allow for meaningful review by articulating the decisions made, the reasons supporting those decisions, and the performance of the attorney-fee calculation. American Civil Liberties Union of Ga. v. Barnes, 168 F.3d 423, 427 (11th Cir.1999); see also Hensley, 461 U.S. at 437, 103 S.Ct. 1933.
The attorney-fee calculation under the lodestar method involves several steps. First, the trial court must determine the number of hours reasonably expended by counsel and a reasonable hourly rate of compensation for counsel's representation. The number of reasonable hours is then multiplied by that reasonable rate, yielding an initial estimate called the "lodestar amount." Edwards, 601 So.2d at 85. The lodestar amount is then adjusted upward or downward depending on certain factors attendant to, among other things, the nature and difficulty of counsel's representation. See id. (quoting Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 564, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)); see also Brown v. State, 565 So.2d 585, 592 (Ala. 1990) (listing 13 factors for the trial court to consider when determining a reasonable attorney fee).
The City has challenged the trial court's decision as to each facet of this calculation, contending (1) that many of the hours claimed by plaintiffs' counsel were excessive or redundant; (2) that the hourly rate determined by the court did not reflect the true value of services rendered, as judged by local standards; and (3) that the trial court's application of a multiplier of 2 was unreasonable.

A. Hours Reasonably Expended

Applicants for an attorney fee bear the burden of proving their entitlement to an award and documenting their appropriately expended hours. Edwards, 601 So.2d at 85; see also Hensley, 461 U.S. at 437, 103 S.Ct. 1933 (citing the importance of documenting in fee applications the hours expended). "The applicant should exercise `billing judgment' with respect to hours worked, and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." Hensley, 461 U.S. at 437, 103 S.Ct. 1933 (citation omitted). As the United States Court of Appeals for the Eleventh Circuit stated in American Civil Liberties Union of Ga. v. Barnes, supra:
"If fee applicants do not exercise billing judgment, courts are obligated to do it for them, to cut the amount of hours for which payment is sought, pruning out those that are `excessive, redundant, or otherwise unnecessary.' Courts are not authorized to be generous with the money of others, and it is as much the duty of courts to see that excessive fees and expenses are not awarded as it is to see that an adequate amount is awarded."
168 F.3d at 428.
In opposition to the hours claimed by plaintiffs' counsel, the City enumerated several instances where it contended that the hours claimed by opposing counsel were duplicative. Our review of the record indicates that the trial court made no detailed findings with respect to these claims. In fact, it appears that the trial court reviewed the time sheet submitted by plaintiffs' counsel only for multiple entries for the same work rather than for instances where attorneys Sullivan and *683 Williams might have duplicated one another's work. As to the latter question, the trial court simply added to its order a general statement declaring those hours to be reasonable and necessary. Therefore, our deference with respect to the trial court's order as to these questions is limited. As we said in Ex parte Edwards, supra, "[a] general statement that the number of hours spent was reasonable or unreasonable is not very helpful and, accordingly, should not be given much weight." 601 So.2d at 86.
The City contends that the trial court overlooked what the City calls redundant billing by plaintiffs' counsel with respect to work preparing briefs, court memoranda, and various responses to the City's submissions. Because of the trial court's silence with respect to these contentions, we are left to examine the record in order to fulfill our duty of meaningful review. Our review of the record discloses billing statements that nebulously describe general tasks but, unfortunately, do not provide sufficient detail. While this situation, by itself, is problematic, see American Civil Liberties Union of Ga., 168 F.3d at 429, testimony presented during the evidentiary hearing provides adequate elucidation supporting the trial court's conclusion of reasonableness.[2] Therefore, we conclude that the trial court did not abuse its discretion by finding that there was no redundant billing with respect to work jointly performed.
We now turn to the City's allegations that some of the hours expended by plaintiffs' counsel were unreasonable.[3] Our review of the record indicates that there was conflicting and credible testimony by both sides as to nearly all of the specific claims of unreasonableness.[4] Because this testimony was oral, we defer to the trial court's resolution of the pertinent factual disputes in favor of the plaintiffs. After considering the trial court's observation, made in its order, regarding the complexity of this case, we conclude that the court did not abuse its discretion with respect to its findings on these matters.
One matter, however, concerns us. The record reveals that plaintiffs' counsel included in their fee application 27 hours spent by Sullivan trying to convince Williams to assist him with the case. We believe that these hours were not essential to the plaintiffs' representation; therefore, we reduce by 27 the number of hours the trial court accepted as reasonablethis reduction yields a total of 5,789.95 hours reasonably expended.

B. The Trial Court's Determination of the Hourly Rate

The City contends that the trial court also abused its discretion with respect *684 to the adjudged hourly rate of compensation. We agree.
The trial court's order is silent as to any justifications for the determined rate of $175 per hour, except for a general statement declaring that the trial court had conducted "numerous fee-award cases over the years" and, therefore, was "familiar with the hourly market rate in the area." We acknowledge that the trial court may indeed have its finger on the pulse of the Birmingham legal community, but, without evidence in the record regarding the area's market rate, we are unable to defer to its conclusions.
The record reflects that Sullivan typically charged clients somewhere between $80 and $150 per hour for his representation. The record contains no other evidence as to rates of compensation. While the complexity of this case generally supports a higher rate, we note that the record is replete with testimony indicating that Sullivan and Williams were unfamiliar with the law applicable in this case and, therefore, had to expend numerous hours acquainting themselves with that law. This degree of unfamiliarity often reflects a lack of experience, which leads us to conclude that Sullivan and Williams had little experience in the area of law involved in this case. Therefore, based on the typical rate usually charged by plaintiffs' counsel, their level of experience in this area of the law, and the complexity of this case, we conclude that $150 per hour is a reasonable rate of compensation.

C. The Trial Court's Determination of the Multiplier

The City argues next that the multiplier established by the trial court was excessive. Such a determination is, once again, a matter we generally leave to the trial court's discretion, see, e.g., Ex parte Edwards, 601 So.2d 82, 85 (Ala. 1992), especially where, as here, the trial court has fully explained its reasoning in its order.
In our review of the trial court's order, we are mindful of the 12 factors set forth in previous cases in which we have been confronted with the question of attorney fees. See Union Fid., 781 So.2d at 192(quoting Edelman & Combs, 663 So.2d at 960 (summarizing 12 factors first enunciated by this Court in Peebles v. Miley, 439 So.2d 137, 140-41 (Ala.1983))). The factor that concerns us most is the benefit to the client received from the hours expended.
The City contends that the multiplier of 2 should be reduced because, it says, a substantial portion of counsel's hours were expended pursuing fee litigation rather than the litigation that provided the substantive benefits of the original case. The history of this case indicates that the attorney-fee litigation began immediately after the Jefferson Circuit Court approved a settlement between the parties regarding the placement of the solid-waste facility. While the law clearly allows for a fee award with respect to those hours, see note 3, supra, we do not consider this time to be vital to the true purpose of the litigation, which was to enhance the due-process rights of Birmingham residents and to prevent the placement of a solid-waste transportation facility in a particular location. Many of the factors set forth in previous decisions by this Court with respect to attorney-fee awards are intended primarily to be applied to the circumstances attendant to the nature of the representation, not attorney-fee litigation. We recognize, however, that some of the factors, such as those pertaining to questions of local compensatory customs, are proper for a court to consider in fee-litigation cases. Nevertheless, the number of hours in this case expended only on fee litigation is so great that we believe the *685 trial court abused its discretion by determining a multiplier of 2. Considering the benefits conferred on the plaintiffs, the time expended on the entire litigation (including the attorney-fee litigation), and the trial court's finding regarding the complexity of this case and counsel's performance, we conclude that a multiplier of 1.5 is warranted. We apply this figure, however, only to those hours expended by plaintiffs' counsel in succeeding in the primary purpose of the litigation, which was to win the enaction of a new city ordinance and to increase due-process protection for Birmingham residents. As best we can discern, the hours expended in those efforts total 2,024. In calculating this portion of counsel's fee, using a 1.5 multiplier, we conclude that plaintiffs' counsel are entitled to a fee of $455,400 for this part of their services.[5] As for their work on matters not essential to the result obtained as a part of their representation, we find that plaintiffs' counsel expended 3,765.95 hours. Because these hours did not directly pertain to the benefit obtained in the Horn litigation, we believe that as to those hours the application of a multiplier is unwarranted. Therefore, in calculating the fee as to these hours, we conclude that, for this portion of their work, plaintiffs' counsel are entitled to a fee of $564,892this figure is arrived at by multiplying the number of hours devoted to this aspect of the case (3,765.95) by the $150 hourly rate. Thus, the total unadjusted fee to which plaintiffs' counsel are entitled equals $1,020,290.50, the sum of the two separately determined fee awards. When we subtract the $250,000 interim attorney fee awarded in this case, we determine that plaintiffs' counsel are fairly and reasonably entitled to a fee award of $770,292.50.

IV.
The final issue presented is whether §§ 11-93-2 and XX-XX-XXX, Ala. Code 1975, limit the City's obligation to pay an attorney fee exceeding $300,000. After carefully reviewing these statutes, we conclude that they do not.
We are unable to read either statute as pertaining to attorney-fee awards. The legislative history of § 11-93-2 soundly suggests that this statute and related enactments apply only to tort liability. The title to Act No. 673, Ala. Acts 1977, part of which is codified at § 11-93-2, Ala.Code 1975, reads:
"AN ACT
"To prescribe and establish monetary limits payable on claims and judgments based on tort liability and filed or obtained against governmental entities...."
See St. Paul Fire & Marine Ins. Co. v. Nowlin, 542 So.2d 1190, 1192-93 (Ala. 1988). Section 11-47-190 also applies only to torts, see Rich v. City of Mobile, 410 So.2d 385, 387 (Ala.1982), albeit torts founded upon negligence. Compare § 11-47-190 with § 11-93-2, Ala.Code 1975.
An award of attorney fees is merely an award of costs; thus, we conclude that § 11-93-2 and § 11-47-190 do not apply to attorney-fee awards.
1991455REVERSED AND JUDGMENT RENDERED.
1991558AFFIRMED.
MOORE, C.J., and LYONS, HARWOOD, WOODALL, and STUART, JJ., concur.
SEE, J., concurs specially.
*686 JOHNSTONE, J., concurs in part, concurs in the result in part, and dissents in part.
HOUSTON, J., concurs in part and dissents in part.
SEE, Justice (concurring specially).
In Alabama, a party may recover attorney fees only when an award is authorized by statute, is provided for by contract, or is justified by a "special equity." Horn v. City of Birmingham, 718 So.2d 691, 692 (Ala.Civ.App.1997), rev'd, Ex parte Horn, 718 So.2d 694 (Ala.1998); see also Blankenship v. City of Hoover, 590 So.2d 245 (Ala.1991). A court may award an attorney fee on the basis that it is justified by a special equity "where the plaintiff's efforts are successful in creating a fund out of which the fees may be paid, or when the efforts of the plaintiff's attorneys render a public service or result in a benefit to the general public in addition to serving the interest of the plaintiff." Ex parte Horn, 718 So.2d 694, 702 (Ala.1998). These circumstances have been termed the "common-fund" and "common-benefit" exceptions. Id.
This Court discussed the common-fund and common-benefit exceptions in Brown v. State, 565 So.2d 585, 592 (Ala.1990), where a class of plaintiffs, each of whom had been convicted of a traffic offense based upon an improperly verified Uniform Traffic Ticket and Complaint ("UTTC"),[6] sued the State of Alabama, the City of Montgomery, and others, seeking to have all convictions based upon improperly verified UTTCs expunged from their records and to have all fines and costs paid as a result of the convictions refunded. 565 So.2d at 586. Although this Court affirmed the judgment of the trial court, which denied the relief sought by the plaintiffs, this Court nevertheless held that the plaintiffs were entitled to an award of attorney fees:
"The plaintiffs have, however, made a significant contribution to the integrity of our system of jurisprudence in calling attention to a serious flaw in its administration. They have done more in that regard to advance the cause of justice than vacating the judgments of the class members would achieve. We are informed by counsel on both sides of this case that because of this and similar litigation, the practice has been discontinued and ... now the officers issuing the UTTC's appear before a judge or magistrate and swear on oath to the charges made therein....
". . . .
"This litigation clearly resulted in a benefit to the general public. It is unquestionable that plaintiffs' attorneys rendered a public service by bringing an end to an improper practice. The public nature of the services rendered by these lawyers justifies an award of attorney fees."
565 So.2d at 591-92 (citation omitted).
Similarly, in Bell v. Birmingham News Co., 576 So.2d 669 (Ala.Civ.App.1991), the Birmingham News Company sought to enjoin the Birmingham City Council from conducting closed sessions to elect the council's president and president pro tempore. The circuit court issued the injunction and awarded attorney fees, reasoning that the citizens of Birmingham "derive a common benefit `by an action which enforces *687 the requirements of the statute that the business of the City Council be conducted in open and public meetings and, specifically, that the election of Council officers be conducted openly and not in secret.'" 576 So.2d at 670. The Court of Civil Appeals, relying on our decision in Brown, supra, determined that the record contained ample evidence supporting the circuit court's conclusion that the plaintiffs' actions "resulted in a benefit to the general public." Id. Therefore, it held, the circuit court's award of fees pursuant to the common-benefit exception was proper.
In this case, the plaintiffs' efforts to prevent the construction of a waste facility in their neighborhood did not produce "a benefit to the general public" like that produced in Brown and Bell. The plaintiffs in Brown and Bell conferred benefits that were state-wide and city-wide, respectively; the plaintiffs' efforts here to have the waste station located in another area have not conferred a similar benefit. Instead, it appears that the plaintiffs' efforts benefited only those in the plaintiffs' immediate neighborhood, to the apparent detriment of those who would use the facility and those who are close to its ultimate location.
This is the third time these parties have come before this Court. In Ex parte Horn, 718 So.2d 694 (Ala.1998), a majority of this Court determined that the common-benefit exception to the American rule applied in this case and that the plaintiffs were therefore entitled to an award of attorney fees paid by the City of Birmingham. I dissented, because I read Brown and Bell to require a benefit to society broader than that provided to a particular neighborhood or group.
The parties came before this Court again in Ex parte City of Birmingham, 757 So.2d 389 (Ala.1999). Following this Court's decision in Ex parte Horn, the trial court had ordered the City to pay an interim attorney-fee award of $250,000, and the City sought mandamus relief in the form of a writ from this Court directing the trial court to vacate its order awarding an interim attorney fee. The City asked this Court to revisit its decision in Ex parte Horn holding the common-benefit exception applicable. This Court denied the City's petition for mandamus relief, and, in doing so, declined to reconsider its holding that the common-benefit exception applied, noting that its prior decision in Ex parte Horn established the law of the case. "Under the `law of the case' doctrine, the `findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal.'" Heathcoat v. Potts, 905 F.2d 367, 370 (11th Cir.1990) (quoting Westbrook v. Zant, 743 F.2d 764, 768 (11th Cir.1984)). Thus, the Court's conclusion that the common-benefit exception applies in this case was binding in the mandamus proceeding.
I dissented in Ex parte Horn because I did not believe our prior decisions supported the conclusion that the common-benefit exception applies in this case. While I adhere to that view, the majority's decision in Ex parte Horn established the law of the case. For that reason alone, I concurred in City of Birmingham, and for that reason alone I concur today.
JOHNSTONE, Justice (concurring in part, concurring in the result in part, and dissenting in part).
I concur in Part I (the facts and the procedural history), in Part II (the rationale and holding approving the lodestar method for calculating the attorney's fees in this case), and the introductory explanation preceding Part I. I concur in the result of the introductory portion of Part III about the method of calculating an *688 attorney's fee under the lodestar method. While the explanation of the method itself is clear and helpful, I question the threat to the ore tenus rule posed by the statement in the main opinion that, "[n]evertheless, the trial court's order regarding an attorney fee must allow for meaningful review by articulating the decisions made, the reasons supporting those decisions, and the performance of the attorney-fee calculation." 810 So.2d at 682. I respectfully dissent from Part III.A. insofar as it infringes the ore tenus rule and tweaks the computation of the compensable hours.
The main opinion says, "Because of the trial court's silence with respect to these contentions, we are left to examine the record in order to fulfill our duty of meaningful review." 810 So.2d at 683. This statement, too, seems to be an incursion on the ore tenus rule. Our general rule of appellate review is that a trial court is deemed to have found all of the facts necessary to its decision, unless such fact findings would be clearly erroneous. Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996) ("It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous"); Lemon v. Golf Terrace Owners Ass'n, 611 So.2d 263, 265 (Ala.1992) ("[W]here a trial court does not make specific findings of fact concerning an issue, this Court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous").
I respectfully dissent from Part III.B. insofar as it tweaks the finding of the trial court on the reasonable hourly rate. The trial judge is entitled to apply common knowledge in the legal community where he presides.
I respectfully dissent from Part III.C. insofar as it reduces the multiplier from 2 to 1.5. The main opinion bases the reduction on a negative analysis of one of the 13 factors. We do not know that the trial judge has not already considered this same negative analysis as to this particular factor but has found the multiplier of 2 appropriate on the basis of one or more of the other 12 factors. The plaintiffs sought a multiplier of 4.5. Mashburn v. National Healthcare, Inc., 684 F.Supp. 679 (M.D.Ala.1988), applied a multiplier greater than 3.
The trial judge's order explains his decision to apply the multiplier of 2:
"This Court believes that an enhancement multiplier is appropriate in this case because this case was extremely difficult, protracted, complex, novel, and because the Plaintiffs' attorneys during various periods of time had to devote essentially all of their time to this case. They suffered financial hardship due to their involvement in the case and used their personal and financial resources for the benefit of the citizens of Birmingham.
"Moreover, an enhancement multiplier is justified because Plaintiffs' only hope of obtaining fees in this case was premised on a special equity exception to the American Rule. In this case Plaintiffs' attorneys did not have a contract and they did not have the benefit of some fee shifting statute which would have guaranteed them a fee in the event that they were prevailing parties. Plaintiffs not only had to prevail, but they had to prove that they provided a common benefit to all of the citizens of Birmingham. They succeeded only when the highest court in the state, the Alabama Supreme Court, made the finding that Plaintiffs' attorneys were entitled to an award under the common benefit or common fund *689 doctrine. The Plaintiffs' chances of prevailing in this case were slim indeed. In fact, this Court publicly opined in the past that Plaintiffs had about as much chance of succeeding in this litigation as a hunchbacked grandmother had of straightening up. The risk that Plaintiffs took and the tremendous efforts Plaintiffs exerted deserve a multiplier as was in Mashburn, 684 F.Supp. 679 (M.D.Ala.1988). In Mashburn, supra, the Plaintiffs were credited with a multiplier of 3.122. The Plaintiffs allege this case was much more complex and difficult than the Mashburn case and seek an enhancement multiplier of 4.5 which would result in claimed fees in excess of 6½ millions."
Our tweaking this multiplier is another violation of the ore tenus rule.
I concur in Part IV of the main opinion. I agree with the rationale and holding "that § 11-93-2 and § 11-47-190[, Ala. Code 1975,] do not apply to attorney-fee awards." 810 So.2d at 685.
In summary, I would affirm the judgment of the trial court in case number 1991455, City of Birmingham v. William Fred Horn. I do concur in the main opinion insofar as it affirms the judgment of the trial court in case number 1991558, William Fred Horn et al. v. City of Birmingham et al.
HOUSTON, Justice (concurring in part and dissenting in part).
I concur to reverse and render a judgment in case number 1991455; however, I dissent as to the amount of the attorney fees awarded.
I concur to affirm in case number 1991558.
Reviewing the briefs and the record, and purposefully not being specific, I am convinced that a lack of billing judgment permeates the attorneys' fee petition. I cannot sanction an award of $150 per hour for most of the hours billed, and I cannot sanction applying a multiplier of 1.5 to an already excessive lodestar award. I am the only Justice remaining on the Court who voted with the majority in Ex parte Horn, 718 So.2d 694 (Ala.1998), to require the City to pay a legal fee to Horn's attorneys. In my opinion, it is an abuse of discretion to award a fee in excess of $581,695 (which includes the $250,000 previously paid) to Horn's attorneys.
NOTES
[1] In Ex parte City of Birmingham, supra, where the City petitioned for a writ of mandamus, we characterized the City's argument in the following manner:

"The City requests further that we overturn our decision in Ex parte Horn, supra, in which we held that the residents are entitled to an attorney fee under the `common-fund' exception."
Ex parte City of Birmingham, 757 So.2d at 392 (emphasis added). The plaintiffs contend in addition to their arguments stated abovethat this restatement of our holding in Horn III was, itself, a holding. That restatement, however, merely described a holding in Horn III, which was another case, and did not directly pertain to our resolution of the issues presented in City of Birmingham. Therefore, we are not bound by that statement in the present case, under the law-of-the-case doctrine. See Gray v. Reynolds, 553 So.2d 79, 81 (Ala.1989) (stating that the Court was not bound by dicta appearing in an opinion in a prior appeal).
[2] Williams testified that he and Sullivan worked together on briefs by performing different tasks. He explained that, at times, he researched a particular area of the law while Sullivan wrote, using research already done. He also testified that they often discussed arguments and strategy as to the preparation of court documents and matters raised by the City.
[3] The City's argument includes an assertion that the plaintiffs should not be allowed to recover attorney fees for hours expended for fee litigation. It is hornbook law, however, that such time is compensable. See Alba Conte, Attorney Fee Awards § 4.21 (2d ed.1993), and the footnotes contained therein.
[4] At the evidentiary hearing, Williams testified that he and Sullivan often collaborated on their filing of, or responses to, briefs and court memoranda. They also testified as to the complexity of the case. The City countered with expert testimony by John Falkenberry, an attorney, who concluded that the hours expended by Williams and Sullivan were excessive.
[5] We arrive at this amount by multiplying 2024 (the number of hours reasonably expended on litigation essential to the result obtained) by the hourly compensation rate of $150 and then multiplying that amount by a 1.5 multiplier.
[6] This Court wrote in Brown:

"The defect in the procedure that we are dealing with in this case is not the stamping of the clerk's name by one authorized to do so. The defect is in putting a citizen to trial on a criminal charge, albeit a misdemeanor, when no one has sworn on oath ... that the citizen has committed an offense."
565 So.2d at 589.